## Coffin, Appellant, *v.* Fidelity-Philadelphia Trust Company.

Argued April 24, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

Appeal, No. 177,

*Charles J. Biddle,* with him *John Ames Ballard* and *Drinker, Biddle & Reath,* for appellants.

*Thomas B. K. Ringe,* with him *Clinton W. Frontz* and *Morgan, Lewis & Bockius,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, June 26, 1953:

The plaintiffs in this assumpsit action sought to recover from the defendant bank the amount of ten checks totalling $75,948.62 drawn by certain predecessor partnerships (in which certain of the plaintiffs were partners) on an account in the defendant bank, on which checks the payees' names were forged by one Neil J. Sullivan. At the time of these events Sullivan was a partner in the firms on whose behalf the checks were drawn. The checks were deposited by Sullivan in his personal account which was also in the defendant bank. This matter came on for trial and the issues were submitted to a jury resulting in a verdict for the defendant bank. The plaintiffs have appealed from the action of the court below in refusing their alternative motions for judgment non obstante veredicto and for a new trial.

On January 1, 1937 the brokerage firm of Rakestraw, Betz & Co., in which Edward H. Rakestraw and George W. Betz, Jr. were the partners, was formed and continued under that name with certain changes in both general and limited partners until October 1, 1945 when Neil J. Sullivan and Edward H. White, Jr. were admitted as general partners. The firm then consisted of Roy R. Coffin, Betz, Sullivan and White as general partners and Rakestraw as a limited partner. A checking account was opened in the defendant bank on January 2, 1937. The business continued under the name of Rakestraw, Betz & Co. until September 3, 1946 when the name was changed to Coffin, Betz & Sullivan; the name on the bank account was also changed on September 3, 1946. When Sullivan withdrew from the firm on March 31, 1949, following the discovery of some of his forgeries, the business was continued by its successors under the name of Coffin, Betz & Co.

Prior to October 1, 1945, from 1940 or 1941, Sullivan was employed as a salesman by the brokerage firm and had several customers of his own. On and after October 1, 1945, when he became a general partner, he shared in the general supervision of personnel, including the cashier, R. J. Smith.

When Sullivan became a general partner he was required to post a capital contribution of $10,000 and at that time he apparently did not have such sum of money available. Accordingly, on October 1, 1945 he took a check in the sum of $11,973.20 drawn to the order of Mary M. Rafferty by the firm, signed by R. J. Smith, their cashier, and forged the endorsement of her name, added his own name as an endorser and deposited the check to his own account in the defendant bank. He then drew a check on his own account to the order of Rakestraw, Betz & Co. to pay for his capital contribution to the firm. At the same time he drew another

check for $1,325 to the order of the firm in reimbursement for withdrawals which he had previously made from the firm's petty cash account.

On March 20, 1946, another check drawn by the cashier of the firm in the sum of $3,500 to the order of Mary M. Rafferty was given to Sullivan for transmission to her. He forged the endorsement of her name as payee and deposited it in his personal account with the defendant bank on March 22, 1946. On March 29, 1946, from the funds so acquired, Sullivan reimbursed the firm in the amount of $1,200 for petty cash previously withdrawn. On June 4, 1946, another check signed by the cashier, payable to Mary M. Rafferty in the sum of $5,000 was given to Sullivan for delivery to the payee, but he again forged her name and deposited it in his personal account. The proceeds of this check were used to meet a check dated May 31, 1946, payable to the firm in the amount of $1,500 due by Sullivan to the firm's petty cash account.

On August 27, 1946, Sullivan was given a check for transmission to Claire M. Mair as payee, in the sum of $5,334.08. He forged her endorsement and deposited the check to his own account on the same day. On August 29, 1946 Smith delivered to Sullivan a check in the sum of $30,366.47 payable to the order of Mary M. Rafferty for transmission to her. He forged her name and deposited the check to his own account at the defendant bank. Sometime prior to August, 1946, Sullivan had engaged to purchase a home on which settlement was to be made on August 21, 1946. In order to effect settlement, Sullivan obtained a certified firm check in the sum of $32,275 and left there his personal check dated August 21, 1946 which was to be made good the next day. Sullivan had discussed this certified check with George W. Betz, Jr., one of his partners, and had explained that he could not draw such

certified check on his own account at that time because he had not yet received certain funds. Sullivan's personal check for $32,275, payable to the firm, remained in the petty cash drawer until August 26th when Smith, the cashier, returned from his vacation and found it there. Smith brought the check to the attention of both Betz and Coffin who demanded that the check be cleared immediately. The check was not deposited, however, until August 30, 1946.

Following the $30,366.47 Rafferty forgery, Sullivan refrained from his depredations for almost a year. In May, 1947 he resumed. On May 20, 1947 Smith, the cashier of the firm, (then trading as Coffin, Betz & Sullivan), drew a check to the order of Mary M. Rafferty in the sum of $1,397.91 and delivered it to Sullivan to transmit to her. He forged her endorsement and deposited it to his own account in the defendant bank. On May 26, 1948 he likewise forged the endorsement of Ann Turner White on a check drawn to her order in the sum of $223.74 and deposited it in his personal account. He also withdrew all of the securities in the White account at that time by means of a receipt on which he forged her name. Some of these securities were later returned and the rest were sold and predicated further forgeries.

On July 16, 1948 he similarly forged the endorsement of Claire M. Mair to a check for $1,898.31 and deposited it in his own account on the same day. Checks dated November 4, 1948 and November 23, 1948, for $9,633.05 and $6,621.86 respectively, were delivered to Sullivan for transmission to Ann Turner White, the payee; he forged her endorsements and deposited each check on the same day in his personal account at the defendant bank.

On March 28, 1949 Philadelphia counsel was retained by Ann Turner White's Washington attorneys

to investigate her claim that the firm owed her certain securities. An investigation followed, on March 29, 1949, which disclosed the withdrawal of her securities by Sullivan on a receipt forged in her name, the subsequent sale of the securities and the drawing of the three checks payable to her order and the forgeries of her endorsements and deposit to Sullivan's account. Sullivan, when confronted with these facts, admitted that he had forged the signatures.

There followed an immediate investigation into all of the accounts handled by Sullivan. Notice that there was a shortage in firm capital was sent to the New York Stock Exchange, the Philadelphia Stock Exchange, the Federal Securities and Exchange Commission, the Pennsylvania Securities and Exchange Commission and the National Association of Security Dealers. Auditors from the New York Stock Exchange and firm accountants conducted a complete audit on the Sullivan accounts and each customer, including those whose accounts were closed, was requested to confirm the accuracy of his account. Sullivan denied that there were any forgeries other than as to the White checks totalling $16,478.65 and the auditors did not discover his other forgeries. Sullivan's resignation was demanded and received on March 31, 1949 and a new partnership agreement was drafted for continuation of the business by the remaining partners. The firm, by April 5, 1949, purchased on the market the stocks improperly sold on Mrs. White's account and reimbursed her for lost dividends and $500 for her expenses and legal fees.

The initial audits conducted by the Stock Exchange and the firm accountants failed to disclose any further wrongdoing on Sullivan's part. However, on or about April 4, 1949 it was discovered that Sullivan had misappropriated five B. & O. bonds from the account of his aunt, Claire M. Mair. These bonds were replaced

by the firm on April 6th and nothing was said to Mrs. Mair. The members of the firm did not wish to tell Mrs. Mair that her nephew was dishonest since she had brought him up since his childhood.

The Rafferty forgeries were not discovered until on and after April 12, 1949. In the period from March 29th to April 12th the plaintiffs were of the opinion that the losses would approximate about $20,000 and they felt that they could handle such loss without presenting any claim against the bank on account of the forgeries. The plaintiffs specifically and intentionally withheld notice from the bank because they anticipated reimbursement by Sullivan and desired to close the matter without further adverse publicity. During this period the firm applied Sullivan's $10,000 capital contribution toward restitution and on April 7th and 8th the firm received two $5,000 payments from one J. H. Rowbotham who advanced these funds on Sullivan's behalf to help him out of his difficulties. It was anticipated by the partners that they could look to the home owned by Sullivan and his wife to make up any balance which might be due.

On April 12, 1949 the Rafferty forgeries were discovered[1] and on April 13, 1949 the firm gave notice of the White and Rafferty forgeries (8 checks) to the bank. The forgeries on the Mair checks were not discovered[2] until July 7, 1949 and notice was given to the bank as to these two checks on July 8, 1949.

---

[1] The previous effort to confirm the Rafferty account by mail was ineffective because it was a discretionary account held in a street name.

[2] No letters of confirmation were sent out on this account following the discovery of the White forgeries since it was a cash account involving only direct purchases and sales, no securities being left with the firm.

After the forgeries were uncovered it was discovered that Sullivan had misappropriated about $20,000 in securities from his sister's (Mrs. Coonley) account in the period 1941 to August, 1944, while he was still a salesman. This loss was covered in part by a surety bond. Sullivan handled this account as though it were his own by virtue of a power of attorney on which he had forged her signature. On one occasion Mr. Coffin had criticized his manner of handling this account because he was depleting the principal; but there was never raised any question as to his authority to handle the account. Sullivan had explained that his sister wished to assist him in getting started in the brokerage business and he was then married and a father.

In about June, 1948 Sullivan borrowed $10,000 from one William J. LaRoche, a firm customer, telling him that the money was to be used for further capital contribution and his note due in January, 1949 was delivered to LaRoche. On January 23, 1949, at Sullivan's request, the cashier deposited to LaRoche's credit a firm check for $10,000, Sullivan having stated that LaRoche would repay it the next day. This was used in effect as a repayment of LaRoche's loan to Sullivan, and LaRoche, of course, made no effort to repay the item. When the repayment was delayed, Smith requested Sullivan to have it made good and finally on March 18, 1949 the matter was brought to the attention of Mr. Coffin. There followed an investigation by Mr. Coffin but before the details were worked out there occurred the discovery of the White forgeries.

In the case of all of the forgeries, Sullivan set in motion the preparation of the checks by turning in the securities for sale and asking that the proceeds be given to him for transmittal. There is no doubt that at the time he intended to embezzle the proceeds of each check. Indeed he so testified when called by the

defendant as on cross-examination. However, each check was made out by the cashier to the order of Mrs. Rafferty, Mrs. Mair and Mrs. White in the belief that they were for bona fide payments of funds due to these customers as shown by the books of the firm.

The major defense offered by the bank is to the effect that the plaintiff firm is chargeable with knowledge that Sullivan would or was likely to forge the endorsements as subsequently discovered; that whether the firm, as maker of the checks, knew or should have known that it was delivering checks to a person who would or was likely to forge the payees' endorsements was a question for and was properly submitted to the jury. To this end various elements of negligence in the conduct of the firm have been stressed.

It was a settled practice in the firm for the partners (and, to a more limited extent, the salesmen) to use the firm's petty cash account to supply themselves with current expenses or even substantial emergency expenditures as against their respective shares of the firm's profits for the current month. Each partner, upon making a withdrawal would leave in the petty cash drawer a slip in the amount withdrawn. At the end of the month there would be a settlement and each partner received his monthly allowance, less withdrawals made. It was generally understood that petty cash withdrawals were not to exceed the amounts that each partner was entitled to for such month, but the rule was broken on various occasions by all of the partners in substantial amounts. Various transactions indicate that Sullivan on occasions withdrew substantial amounts from the petty cash account and made repayment slowly or with difficulty. In September, 1948 he withdrew up to $7,000 and deposited as reimbursement a postdated check which remained in the petty cash drawer for "over a week". On October 22, 1948

he reimbursed the petty cash account with a check for $7,500 which was not deposited until December 31, 1948. The $32,275 check in August, 1946 has been referred to above.

It is difficult to conclude, upon a careful consideration of the evidence, that there was anything so unusual in Sullivan's *known* dealings with the petty cash account that gave his partners reason to believe that he was an embezzler and forger. The New York Stock Exchange in its letter of October 14, 1948 (eight of the forgeries had already been committed) drew the attention of Mr. Coffin to the fact that the balance in the petty cash account was $20,000 and that one of the items was a Sullivan check for $7,000 which had been postdated to September 30, 1948, and left in the account for "over a week". At the same time, however, Mr. Betz had received advances totalling $7,158.60 and there was also a $5,000 loan to him about which the Exchange made inquiry. When Mr. Coffin made his reply to the Exchange letter on October 23, 1948, he specifically requested advice as to the method of handling partners' advances. At that time his letter shows that both he and Mr. Betz had larger withdrawals from the petty cash account than Sullivan. The Exchange did not make any reply until December 31, 1948 (all of the forgeries had already been committed) and suggestions were made on handling the petty cash account. There is no evidence whether these suggestions were complied with; but, in any event, the correspondence was essentially concerned with accounting procedure and the maintenance of a minimum capitalization. It is one thing in *retrospect* to conclude that Sullivan's partners should have suspected him of the felony of forgery and quite another to consider the actual contextual course of these events. His partners, had they a graphic review of his financial affairs before them,

may well have considered him careless and dilatory in fulfilling his financial engagements, but how could they be charged with knowledge that this apparently well-bred and respected partner was a forger and a felon? In so far as it is contended that the partners should have known that Sullivan was living beyond his means, particularly in the matter of the house purchase, Mr. Betz pointed out that it was believed that Sullivan had inherited funds as a result of the deaths of various members of his family and had also received funds through Mrs. Sullivan. It was also believed that he received assistance from his aunt who was a wealthy woman with a large account in the plaintiff firm. Experience tells us that we are not necessarily familiar with the details of the financial affairs of our business associates.

It must be carefully noted that Sullivan's derelictions were not discovered until *after* the forgeries had been accomplished. The dishonest and fraudulent acts in which Sullivan engaged were not known to the partners in time and in such circumstances as to put the partners on notice that he was a forger. There must be excluded from any judgment of the knowledge chargeable to the partnership in this regard the misappropriation of Mrs. Coonley's securities, the misappropriation of the Mair securities, the forgeries themselves and the LaRoche loan secured under false pretenses. The defendant bank in its brief continually refers to Sullivan's dishonest acts as though they were a matter of public record. Of course none of these matters were known until March, 1949.

The defendant bank contends that the partners *should* have known that Sullivan was living beyond his income; that if various steps had been taken his misdoings *would* have been discovered. *If* the partners had checked on Sullivan's use of his sister's account,

*if* they had investigated where he was to get his capital contribution of $10,000, *if* inquiry had been made as to why he postdated certain checks, *if* Smith the cashier, had checked the returned checks, *if* the partners had investigated his financial affairs with regard to his high petty cash debits, *if* Smith had been suspicious and checked where Sullivan was to get $32,000 for his home purchase, *if* Smith had discovered the promptness with which some of the checks were placed in Sullivan's account—if any of these things occurred, it is contended, Sullivan would have been unmasked. But the plaintiffs did not owe to the defendant bank any duty to be suspicious of Sullivan and the farsightedness of retrospection does not determine the question of breach of duty owed to the drawee bank. It is easy to say after the story is unfolded and after the plot is completed, "I knew it all the time". The plaintiffs, by law so settled as to require no citation, owed no duty to examine the endorsements on its checks.

It is significant that the negligence with which defendant charges the plaintiff firm must almost invariably be phrased in the subjunctive mood. Yet all of such conjectures do not scale the barrier that it is unreasonable to expect the plaintiffs to have suspected their partner of crime. The defendant's suggestion, in its brief, that the jury could have found that plaintiffs actually and in fact knew of the forgeries prior to March 29, 1949 or that they deliberately avoided such knowledge is unsupported by the uncontradicted evidence.

There is an initial attraction to the supposition that the partnership should bear the burden of its own partner's dishonesty; that somehow the innocence of each side should be weighed in a sort of doctrine of comparative negligence. That is not the state of the law. As we shall hereafter indicate, the liability of the bank

is not founded upon negligence but upon breach of contract and its liability is absolute unless negligence of a particular type (not just negligence in general), within the meaning of the Negotiable Instruments Law, appears and bars recovery for breach of contract.

In any event, as a matter of law, the defendant's offered defense of plaintiffs' negligence in the conduct of their business affairs is insufficient; it has not been shown that plaintiffs' negligence proximately induced the defendant bank's breach of its contract of deposit.

The basic principle of law relied on by the plaintiffs is not disputed by the defendant bank, namely, that a bank by accepting a deposit guarantees that it will not pay the depositor's money except (1) to the depositor or (2) to the payee named by the depositor in checks drawn on the bank or (3) to the person who by reason of a valid endorsement from the payee becomes entitled to such payment. This undertaking by the bank is contractual in nature, the relationship of depositor to bank being that of creditor and debtor, and the liability of the bank in the event of a breach of its guarantee is absolute; ". . . no amount of care to avoid error will protect it from liability if it pays to a wrong person; it must ascertain and act upon the genuineness of the endorsement at its peril.". *Land Title Bank & Trust Company v. Cheltenham National Bank*, 362 Pa. 30, 35 (1949), 66 A. 2d 768; *United Security Life Insurance and Trust Company of Penna. v. Central National Bank of Phila.*, 185 Pa. 586 (1898), 40 A. 97; *National Union Fire Insurance Co. v. Mellon National Bank*, 276 Pa. 212 (1923), 119 A. 910.

Section 23 of the Negotiable Instruments Law of 1901, P. L. 194, 56 PS §28, codifying the substance of the foregoing rule provides, "When a signature is forged or made without the authority of the person whose sig-

nature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, *unless the party against whom it is sought to enforce such right is precluded from setting up the forgery* or want of authority.". (Emphasis supplied)

In *Johnson v. First National Bank of Beaver Falls,* 367 Pa. 459, 462-3 (1951), 81 A. 2d 95, Mr. Justice JONES referred to the meaning judicially ascribed to the term "precluded" and stated: ". . . The word 'precluded', as used in Section 23 of the N. I. L., has been construed in this State, as well as elsewhere, to mean 'estopped' which necessarily connotes harm or at least unfairness, otherwise, to the one asserting the estoppel. In Commonwealth v. Globe Indemnity Company, 323 Pa. 261, 266, 185 A. 796, Mr. Justice LINN, speaking for this court, said with respect to the effect of a forgery,—'Being a forgery, section 23 declares that "it is wholly inoperative" and confers "no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto" *unless the drawer is estopped'* (Emphasis supplied). In First National Bank of Shoemakersville v. Albright, 111 Pa. Superior Ct. 392, 397, 398, 170 A. 370, Judge (later Mr. Justice) PARKER said,—'We understand that the word "precluded" as used in the Act of 1901 is equivalent to "estopped".' In such connection, the same opinion further stated that 'negligence is treated as a ground of estoppel' . . .".

The significance of the above cases is that they have not by interpretation expanded the term "precluded" beyond the intent of the statutory exception. Thus failure to give notice of a forgery is not itself a bar to recovery unless that failure precludes i.e. estops the depositor; negligence alone is not a bar to recovery

unless it is such negligence as precludes i.e. estops the depositor.

An examination of the cases in this Commonwealth and elsewhere[3] demonstrates that where the question of negligence as an estoppel has been considered it has been limited to such negligence as directly and proximately affects the conduct of the bank in passing the forgery; that the bank has no standing to complain of other unrelated negligence. Negligence which did not *proximately* induce injury would not even predicate a tort action, much less an estoppel in the assertion of a contract remedy.

In *Land Title Bank & Trust Company v. Cheltenham National Bank,* 362 Pa. 30, supra, Chief Justice (then Justice) HORACE STERN stated on behalf of a unanimous court at pps. 39-40: "Another principle which makes defendant's contention unavailable is that, in any event, the only kind of negligence that precludes the drawer of a check from recovery from the bank which has cashed it on a forged endorsement is negligence in respect to the preparation of the check itself, as for example, where the check is drawn in such manner that the name of the payee may easily be altered, or where there have been left unfilled blanks, or where there is some similar act of carelessness that facilitates the commission of the fraud by which the proceeds of the check are improperly obtained: see Washington Loan & Trust Co. v. United States, 134 F. 2d 59, 63. Finally even if plaintiff was negligent in the sense that it allowed itself to be duped in accepting from Bennewitt the fraudulently executed

---

[3] See generally 5 Uniform Laws Annotated, Negotiable Instruments, Section 23; 146 A.L.R. 840, Annotation, "Rights and obligations between depositor and bank which pays forged check, as affected by provisions of Negotiable Instruments Act"; 7 Am. Jur., Banks, Section 591.

bond and mortgage, such negligence was not in any way related to or connected with the act of defendant in paying out on the forged indorsement; by that act it violated an absolute and positive duty. Defendant had nothing whatever to do with the transactions in plaintiff's settlement department, had indeed no knowledge thereof, and could not possibly, therefore, have acted in reliance thereon; the mortgage settlements and the improper cashing of the checks had no relation to one another of cause and effect; they were wholly distinct transactions. *The negligence of the drawer of a check is immaterial unless it is such as directly and proximately affects the conduct of the bank in the performance of its duties,* and here there was no act of plaintiff which misled defendant into believing that it could safely cash the check for Bennewitt. There is a veritable host of authorities to the effect that where, by fraud or chicanery of any sort, one is led to issue a check to the perpetrator of the fraud, that fact does not relieve from liability the subsequent act of a bank in cashing the check on an indorsement of the payee forged thereon by the person who deluded the drawer. A number of such cases, naturally varying in their circumstances but all proclaiming and following this principle, are cited in the note.". (Emphasis supplied).

An examination of the 19 cases there cited in the note indicates that the law was quite correctly stated. We shall make reference to some of these cases and also to several which were not referred to in the note.

In *Washington Loan & Trust Co. v. United States,* 134 F. 2d 59, (U. S. Ct. of Appeals for D. of C., 1943) one Stitely, a government employe, prepared fraudulent payroll vouchers for nonexistent federal employes at an imaginary Civilian Conservation Camp. Checks were prepared by the disbursing officer for Chief of Finance of the War Department and were given to

Stitely for delivery to the payees. He forged the payees' signatures and cashed or deposited the checks to his credit at certain defendant banks. The record showed that a proper bookkeeping system was not in effect and that the books were not even in balance. The disbursing officer knew that Stitely took expensive trips to Florida but always returned for paydays.

It was contended that the forgeries were made easy and possible by the improper methods adopted by the government to protect its funds; that the negligence continued over a period of four or five years during which time the accounts were not balanced nor the books reconciled. The court affirmed judgments entered for the government by the District Court on directed verdicts and fully and carefully reviewed the law, holding that neither the negligence in the issuance of the checks nor the late discovery of the forgeries constituted a defense in the nature of an equitable estoppel. The court sustained the position, pursuant to a statutory provision similar to Pennsylvania's that there could only be an estoppel if the drawer's negligence ". . . directly and proximately affected the conduct of the Banks", that the drawer ". . . owed no duty to the Banks with reference to the endorsements, and made no representation with respect to them, and because the Banks were under a duty to determine the genuineness of the endorsements and accepted the checks solely on their own belief in their genuineness. . . .".

Chief Judge Groner cited and discussed numerous cases and referred to analogous facts in *United States v. National Exchange Bank of Providence*, 214 U. S. 302, and stated, "In such a state of facts the Supreme Court held that the bank, in paying the forged checks, acted wholly upon the apparent genuineness of the instruments and the responsibility of those presenting

them, that the Government, in the circumstances, was not charged with knowledge of its payees' signatures, and that, consequently, its failure to detect the forgeries did not estop it from recovery. In other words, the failure of the Government to detect the fraud, though due to negligence, was not the cause of the loss, since in the whole transaction the Government and the bank dealt at arm's length, and the primary obligation of the bank to see to the genuineness of the endorsements continued throughout.".

Judge GRONER in disposing of *Erickson v. Iowa Nat. Bk.,* 211 Iowa 495, 230 N.W. 342; *Young v. Gretna Trust & Sav. Bk.,* 184 La. 872, 168 So. 85 and *Defiance Lumber Co. v. Bank of Cal.,* 180 Wash. 533, 41 P. 2d 135, 99 A.L.R. 426, as authority for the rule that ". . . where a dishonest employee is able to carry on a planned course of forgery for a long period of time, involving numerous transactions, it is at least permissible for a jury to find that there has been negligence in the business practices and methods of the drawer, and that, if such negligence is found, it will preclude recovery against the drawee or prior endorsers. . . .", stated: "But these cases are wholly out of line with what must be recognized as the established rule in the United States, including the District of Columbia.".

In *Los Angeles Investment Company v. Home Savings Bank of Los Angeles,* 180 Cal. 601, 609-10, 182 P. 293, 297, 5 A.L.R. 1193 (1919), the Supreme Court of California refused to entertain the defense that the drawer negligently drew and delivered checks on false vouchers of a dishonest employe and failed to discover the forgeries more promptly. The court stated: ". . . The lower court found such negligence, and it is urged upon us that the question being one of fact is concluded on appeal by such finding. This is not true, of course, if there is no conflict in the evidence (and there is none),

and the conclusion of negligence is one which cannot be reasonably drawn from the probative facts . . . in this case. The company had rather an elaborate system of approving, checking, and entering demands before checks were drawn to pay them. It was, as we have said, very similar to the systems found in other large corporations . . . . trust must be placed in someone . . . and necessarily in heads of departments. If trusting them in regard to demands for checks for disbursements regular upon their face is negligence, so it would be negligence to trust them in a hundred other ways in which it is within their power to defraud their employer. Business could not be conducted on any such basis. It is impossible for any large concern to investigate minutely in advance every demand for disbursement necessary for it to make in its daily business. The delay and expense of so doing would be too great. But however this may be, even if the company were guilty of negligence in signing the checks upon the fraudulent demands of Emory, it is plain that such negligence did not contribute to or induce the acceptance by the banks of the forged indorsements. The forgery of the indorsements was entirely distinct from the issuance of the checks on false demands, and there was no relation between them. . . This point also is discussed in Jordan Marsh Co. v. National Shawmut Bank, supra, and the matter is there summed up as follows (201 Mass. 397, 408) [87 N.E. 740, 742, 22 L.R.A. (N.S.) 250 (1909)]: 'But the whole duty of seeing whether there is a forgery of such an indorsement upon any check rests primarily upon the banker. The drawer of the check has nothing to do with that. Ordinarily, he makes no representation that has any relation to it. In the case just supposed he made no representation in regard to it. The checks payable to the order of A. L. Sefton, which she did not indorse, were

wrongly paid, and the defendant's liability for payment is like that for the payment of any other check bearing such a forged indorsement. The plaintiff had nothing to do with the payment, or with the defendant's performance or nonperformance of its duty to see that payment was made to the right person. There are many cases that illustrate the rule that negligence of the maker is immaterial unless it is of a kind that directly and proximately affects the conduct of the banker in the performance of his duties. [Citing many cases.]' ".

In *Fitzgibbons Boiler Co., Inc. v. National City Bank of New York et al.,* 287 N. Y. 326, 39 N.E. 2d 897 (1942) the plaintiff depositor sought to recover sums paid out on forged payees' endorsements. The forgeries were committed by the assistant treasurer and credit manager of the plaintiff corporation. The Court of Appeals, per FINCH J., stated on the issue of negligence, (page 331) : ". . . The negligence of the depositor will bar recovery also where it has lulled the drawee bank into relaxing the vigilance it should have exercised in guarding against forged endorsements. There is no evidence in the record that the failure of the drawee banks to carry out the contract which they had undertaken was the proximate result of any act or failure to act on the part of the plaintiff depositor [citing cases].".

And at page 333, "Concerning the relation of the negligence of the depositor to the contractual undertaking of the banks not to pay out upon forged endorsements, we have said: 'The drawer owed to the drawee the duty only that it would not by act or misrepresentation facilitate a fraud upon it. . . Negligent failure by the drawer to protect itself against fraud in procuring the making of the drafts does not cast upon the drawer the risk that they will be paid upon a forged endorse-

ment.' American Surety Co. of New York v. Empire Trust Co., 262 N. Y. at p. 186, . . .".

Bearing in mind that the depositor's right of action against a drawee bank for improperly charging forged items to his account is *contractual* in nature, it is apparent that negligence qua negligence cannot negate such right of action. The defense set forth in the statute that the depositor may be precluded from asserting his cause of action, by settled interpretation refers to an estoppel. Such estoppel does not arise from negligence, no matter how gross, unless it is such negligence that affirmatively induced and contributed to the bank's breach of its contract of deposit.

In *Scott et al. v. First Nat. Bank in St. Louis,* 343 Mo. 77, 119 S.W. (2d) 929 (1938), the plaintiff drawer brought an action to recover from the drawee bank for 40 checks charged to its account, on which checks the payees' endorsements had been forged by plaintiff's bookkeeper. The court stated in the course of its lengthy per curiam opinion (p. 89) : ". . . This court . . . reviewed the authorities, stated the prevailing rule, and established the principles to be followed on the question herein involved, in American Sash & Door Co. v. Commerce Trust Co., 332 Mo. 98, 110, 56 S.W. 2d 1034, as follows: 'By the overwhelming weight of authority the negligence of a depositor which will relieve the drawee bank from cashing on a forged indorsement his check delivered to one person but made payable to the order of another, must be such as relates to the forgery or its detection and the payment of the check, not to the mere mistaken issuance thereof. The relation between the bank and the depositor is that of debtor and creditor. The bank's duty to make charges against the depositor's account only on his authentic order and genuine indorsements is absolute-contractual. It is not simply a question of using due care and of offset-

ting negligence against contributory negligence. To be available as a defense the negligence of the depositor must be of such nature as to interfere with the bank's performance of its contract, and in effect amount to a representation operating as an estoppel.".

The defendant bank has strenuously argued that the plaintiffs are precluded from recovering on account of the forgeries because they failed to give timely notice thereof to the bank. It should be immediately clear that in no event could such defense be offered on account of the Rafferty and Mair forgeries since notices as to these checks were promptly given on the day following their discovery. As to the White forgeries, however, we are of the opinion that the defendant bank must be fully credited with payment on account of these items; that the plaintiffs are estopped from asserting any claim on them.

The ten checks forged in this case amounted to a total of $75,948.62. Of these ten checks the White forgeries amounted to $16,478.65. On March 31, 1949 the plaintiff firm transferred the sum of $10,000 from Sullivan's capital contribution toward covering these forgeries; it also received on April 7th and 8th two payments of $5,000 each from J. H. Rowbotham, a friend of Sullivan. The $20,000 thus received by the firm prior to the discovery of the Rafferty forgeries on April 12, 1949 was primarily intended to cover the White forgeries and that is the reason no notice was given to the defendant bank until April 13, 1949. Mr. Coffin testified that they did not consider it a matter for the bank; that they had no intention of going to the bank when they thought the misappropriations would approximate only about $20,000.

The plaintiff depositors are clearly estopped from asserting any claim on account of the White forgeries because they elected to deliberately withhold notifica-

tion to the bank pending their marshalling of Sullivan's assets and such additional assets as they could persuade his family and friends to advance on his behalf. Whether the bank would have been as successful as the plaintiffs in collecting such funds is a question we need not answer, it was entitled to an opportunity to do so. Since it was not afforded such opportunity, the plaintiffs' contentions that the bank could not have demanded Sullivan's capital contribution, or required Rowbotham to pay $10,000; that the bank could not have compelled a transfer of the equity in Sullivan's home because it was also in his wife's name are beside the point. The bank could have used the same methods as the plaintiffs to reduce its liability. Indeed, there is no reason to suppose that if the bank had caused or threatened to cause legal action to be taken against Sullivan, that his desire to make restitution would have decreased or that his friends and wife would have been less disposed to come to his aid.

The plaintiffs refer to the cases of *Chestnut Street Trust & Saving Fund Company v. Hart,* 217 Pa. 506 (1907), 66 A. 870; *Elmira P. Risher and Alvin D. Risher, Executors of Levi Risher, Deceased, v. John M. Risher and Stephen S. Crump, as Individuals and as Attorneys in Fact,* 194 Pa. 164 (1899), 45 A. 71, and *Harmony Creamery Company v. Bickerton,* 57 Pa. Superior Ct. 651 (1914) for the principle that they had the right to apply restitution payments against those debts which they deemed least secure. In the *Risher* case the Court stated the applicable law as follows: "The rule in this state, as held by the referee and court below, is, that a debtor may appropriate his payments as he sees fit at the time he makes them; if he makes none, the creditor can make such appropriation on one or more of several obligations; if neither, at the time of payment, make such appropriation, then the law

will make one to the debts oldest in point of time: Souder v. Schechterly, 91 Pa. 86; Pardee v. Markle, 111 Pa. 548, and many other cases. Where the debtor makes no appropriation, and the creditor does so, the latter may apply it to that item of debt which to him seems least secure: Reed v. Ward, 22 Pa. 144; Hollister v. Davis, 54 Pa. 508. . . .". But this rule can only refer to claims of a creditor which are known or have been discovered, no appropriation could be made as to unknown or future debts and when the payments here were received they then and there were appropriated to wipe out the known White forgeries and the plaintiffs quite understandably having been fully reimbursed with respect thereto, did not notify the bank.

The defendant contends that the plaintiffs in any event cannot maintain this suit because they were, for certain periods, not properly registered under the Fictitious Names Acts of June 28, 1917, P. L. 645, and May 24, 1945, P. L. 967, 54 PS §28.4. It was stipulated by the parties, however, that since "shortly after" April 14, 1949 "the registration of Coffin, Betz & Co. has at all times complied with the provisions" of the Act. This action was commenced on November 28, 1950 and at the time of the commencement of the action the plaintiffs were properly registered. This is all that Section 4 of the Act requires.

Additional contentions made by defendant were variously raised and repudiated in the many cases cited and discussed above. With respect to the contention that the checks involved herein were in legal effect payable to bearer, see also *National Union Fire Insurance Co. v. Mellon National Bank*, 276 Pa. 212, 119 A. 910; with respect to the contention that Sullivan as a general partner bound the other partners by his actions, see Uniform Partnership Act of March 26, 1915, P. L. 18, Part III, Section 12, 59 PS §34; with respect

to the contention that part of the proceeds of the forged checks passed into the partnership as part payments by Sullivan on debts due the partnership, see also *Grubnau et al., to use v. Centennial National Bank*, 279 Pa. 501, 124 A. 142, and Restatement, Trusts, §304 (2). All of these contentions are without merit.

Sullivan made certain payments to Mary M. Rafferty from his personal funds, as set forth in paragraph 22 of the stipulation of counsel, totalling $13,800 and it is agreed that the defendant bank is accordingly entitled to a credit in such amount on the Rafferty forgeries. It is also agreed that the defendant bank is entitled to an additional credit of $5,732.39 on the Mair forgeries by reason of the fact that settlement was made by the plaintiff firm for the sum of $1,500 on that portion of her claim against the firm relating to the two forged checks in the total amount of $7,232.39. These two credits total $19,532.39. This reduces the plaintiff firm's claim on account of the forgeries to $56,416.23 ($75,948.62 minus $19,532.39). The credit to which defendant is entitled in the amount of $16,478.65 with respect to the White forgeries, further reduces plaintiff firm's claim to $39,937.58.

In Exhibit A of the stipulation the plaintiff firm has listed various claims it had against Sullivan, exclusive of the forgeries, designated "non-check" claims. These claims, as stated by the partnership, total $37,041.30.[4] Exhibit A also lists a schedule of sums received from Sullivan and other persons in restitution to the firm. The total of this fund, $37,286.89, includes the $10,000 transferred from Sullivan's capital account and the two $5,000 payments made on his behalf by

---

[4] This figure includes a legal fee of $6,000 charged against plaintiff firm which appears separately in Neil J. Sullivan's restitution account in Exhibit A.

J. H. Rowbotham, previously referred to. Appellee contends that certain of the non-check claims made by the firm against Sullivan were improper and to the extent of such claims the bank should receive credit. The total of these allegedly improper claims, as set out in appellee's brief, is $11,538.74. Assuming, without deciding, that appellee's position is correct, there would be a balance of $25,502.56 of non-check claims by the firm against Sullivan, the propriety of which appellee does not question. We have previously decided that of the $37,286.89 received by the firm in restitution from Sullivan and his friends, $16,478.65 must be applied to the White forgeries. Thus there was available from the restitution fund only $20,808.24 which could be applied by the firm against non-check claims. Since appellee admits that the firm had $25,-502.56 of valid non-check claims against Sullivan, under the principle of *Risher v. Risher,* 194 Pa. 164, supra, the firm had the right to apply the entire balance of the restitution fund to such concededly valid non-check claims.

Since the appellants' case rested entirely upon documentary evidence with no reliance upon oral testimony so that the rule in *Nanty-Glo Boro. v. American Surety Co.,* 309 Pa. 236, 163 A. 523, is not applicable, we are of the opinion that appellants were entitled to binding instructions in the court below and that their motion for judgment non obstante veredicto should have been granted in the amount of the principal sum of $39,937.58. The record discloses that counsel agreed that if the plaintiffs were entitled to recover in any amount, they would be entitled to interest thereon at the rate of 6% from April 13, 1949. We therefore enter the following order:

The judgment on the verdict for defendant is reversed and judgment is here entered for plaintiffs

against the defendant in the sum of $39,937.58, with interest from April 13, 1949.

Mr. Justice BELL dissents.