405 A.2d 530

**FEDERAL PACIFIC ELECTRIC COMPANY, Appellant,**

**v.**

**FIRST PENNSYLVANIA BANK and the Fidelity Bank, Defendants,**

**and**

**Sheldon Paul and Loren Electric Service Company, Additional Defendants,**

**and**

**PBS, Inc., Additional Defendant.**

Superior Court of Pennsylvania.

Argued Dec. 5, 1978.

Decided June 1, 1979.

472

A. Martin Herring, Philadelphia, for appellant.

Marjorie G. Marinoff, Philadelphia, for appellees, First Pennsylvania Bank and The Fidelity Bank.

Henry I. Jacobson, Philadelphia, for appellees, Sheldon Paul and Loren Electric Service Company.

No brief filed for appellee, PBS, Inc.

Before VAN der VOORT, WIEAND and LIPEZ, JJ.

VAN der VOORT, Judge:

This action arises out of a dispute over the negotiation of a check drawn to two payees, Federal Pacific Electric Company (Federal Pacific) and Loren Electric Service Company (Loren). The check was drawn by PBS, Inc. (PBS) on First Pennsylvania Bank (First Pennsylvania), endorsed with the names of both payees by Mr. Sheldon Paul (Paul), president of Loren, and deposited in Loren's account at The Fidelity Bank (Fidelity). The check was forwarded for collection to First Pennsylvania which honored it and debited the account of PBS in the amount of the check, $50,337.40.

PBS assigned its rights against the banks for negotiating the check to Federal Pacific which brought suit against the two banks for that portion of the check not paid to it. It was Federal Pacific's contention that the endorsement of its name on the check by Paul was unauthorized. The banks joined Paul and Loren as additional defendants and they in turn joined PBS.

The case was tried without a jury and a judgment was entered in favor of the banks and Paul. Loren was awarded a judgment for $6,282.10 against Federal Pacific on a counterclaim for charge-backs growing out of the shipment of defective material and the shipment of other goods in an improper manner. PBS obtained a judgment by default against Loren for $3,520.51 for expenses incurred in completing Loren's contract. Loren's judgment was amply sustained by credible evidence and PBS's judgment was entered by default. We affirm both. They have no bearing on the lower court's judgment in favor of the banks, but relate only to the state of accounts between Federal Pacific, Loren and PBS.

The central issue in this litigation is whether the endorsement of the check by Paul on behalf of Loren was unauthorized and constituted a forgery. The circumstances out of which the check materialized were these: PBS was the prime contractor for the installation of fire protection equipment at the Philadelphia Navy Yard. Loren was a subcontractor for PBS for electrical work on the project for a contract price of $140,000 which was increased to $145,500 by authorized extras. Federal Pacific was a supplier of materials from whom Loren ordered three substations and motor control centers at a contract price of $85,000.

There were recurring problems between the contracting parties during the course of the work. Federal Pacific was late in deliveries and aggravated matters by occasional shipments of defective material which had to be returned. Loren, in turn, fell behind in delivery schedules with PBS, due in substantial part to its difficulties with Federal Pacific. Naval red tape delayed progress payments to PBS and this in turn delayed payments to Loren by PBS.

Loren was not a regular customer of Federal Pacific and did not have established credit. In order to expedite deliveries, PBS agreed to guarantee payment for equipment shipped by Federal Pacific by paying Loren in checks drawn jointly to Federal Pacific and Loren. Loren in turn was to endorse the checks and deliver them to Federal Pacific, which would apply them to its account with Loren.

Out of this background, PBS issued a check on May 8, 1972 in the sum of $50,337.40, payable jointly to the order of Loren and Federal Pacific and drawn upon First Pennsylvania. Upon receipt of the check by Loren, its president, Paul, attempted to negotiate an agreement with Federal Pacific whereby the proceeds would be divided between the payees. After attempting without success to reach the president of Federal Pacific by telephone, Paul telephoned the Philadelphia District Sales Manager of Federal Pacific and proposed a division of the proceeds under which Federal Pacific would be paid $20,000 and the balance retained by Loren. Whether Federal Pacific's Philadelphia sales manager agreed to

the arrangement is disputed. But in any event, he was advised by Paul that Federal Pacific would be paid $20,000 and Loren would keep the balance. Paul then endorsed the names of both payees on the check and deposited it to Loren's account at The Fidelity Bank. Concurrently, he paid Federal Pacific $20,000 and advised the controller and project manager of PBS of what he had done.

Relations between the contracting parties were strained by Loren's action in cashing the check and keeping $30,000 of the proceeds. Federal Pacific threatened Paul with criminal prosecution, but Loren was not removed as subcontractor, and work on the project proceeded as usual. First Pennsylvania was advised on or about June 19, 1972 that a claim of forged endorsement would be filed by Federal Pacific, but no such claim was ever made. No demand was made on First Pennsylvania to stop payment on the check or on Fidelity to freeze the money in Loren's account. Indeed, neither bank was asked to do anything.

In an effort to improve the working relationships of the parties, Loren arranged a meeting with representatives of Federal Pacific and PBS on July 24, 1972. The meeting resulted in a written memorandum signed by the representatives of each of the three parties which read as follows:

July 24, 1972

## MEMO

"It is understood that:

1. Loren Electric Service Co. (Loren), shall pay to Federal Pacific Electric Co. (Federal) the sum of $12,000; $6,000 on Wednesday, July 26, 1972 and $6,000 on Wednesday, August 2, 1972.

2. Loren shall have men on the site on Wednesday, July 26, 1972, and shall complete the job.

3. PBS, Inc. shall pay monies due to Loren to Federal directly.

4. Loren has certain "back charges" it believes proper which will be presented to Federal for its review and

possible later agreement with Loren, at a later date, after all monies had been paid."

By this agreement, each of the parties obtained something of value. PBS obtained the commitment of Loren and Federal Pacific to stay on the job and complete the project. Federal Pacific obtained a $12,000 commitment from Loren and the assignment to it by PBS of any further sums otherwise payable to Loren. Loren obtained the commitment of Federal Pacific to review its claim for charge-backs for defective material and improper shipments.

Neither First Pennsylvania nor Fidelity were invited to the meeting of July 24, nor were they even told of it until August 3, 1972 when Federal Pacific wrote Fidelity as follows:

"Arrangements have been concluded among the interested parties whereby Loren will complete the work at the Navy Yard on the job for which the check in question was issued. The interested parties, including our client, have agreed that the Loren checking account with your bank may be released in the following manner:

1. A certified check of Loren in the amount of $6,000 is to be delivered to Samuel M. Lehrer, Esquire, an attorney for Federal Pacific; and

2. The balance of the account, not in excess of $2,000, is to be paid to Loren Electric.

It is hoped that with these funds Loren will be able to complete its work at the Navy Yard and be in a position to pay all amounts owing by reason of the diversion of the check in question."

This was plainly a notification to the banks that the dispute over the check had been settled.

Work resumed on the project at the Navy Yard and continued intermittently over the next seven months, although not without tension between the parties, growing largely out of delays in shipments and installations. In March 1973, Loren and PBS had a final falling-out and Loren was removed from the job. PBS hired others to

finish the work at a cost to it of $3,520.51, for which PBS won a default judgment against Loren from the court below.

At the time of Loren's removal from the job, Federal Pacific had been paid $29,000 by Loren and $32,202 directly by PBS for a total payment of $61,202 on its $85,000 contract with Loren. However, Loren has obtained a judgment for $6,282.10 from the court below on account of charge-backs against Federal Pacific for defective material and improper shipments, which reduces Loren's unpaid obligation to Federal Pacific to $17,515.90. On the other hand, PBS has paid Loren directly, or to Federal Pacific for Loren's account, a total of $117,260.75 on its $145,500 contractual obligation, leaving an unpaid balance due of $28,-239.25. PBS is entitled to a set-off of $3,520.51 on the default judgment obtained from the court below for the cost of hiring others to finish Loren's work, leaving a net balance of $24,718.74 due Loren under the terms of its contract with PBS, but assigned to Federal Pacific under the terms of the July 24th agreement. This more than covers the $17,515.90 balance owing to Federal Pacific by Loren, if paid. If the banks were to be held liable for negotiating the disputed check, the extent of Federal Pacific's loss, if any, would be determined by these figures.

If there is a dispute between PBS and Federal Pacific over the settlement of their accounts, it is not raised by the pleadings. Nor could there have been an adjudication of the rights of PBS and Federal Pacific against each other in this litigation in view of the assignment by PBS to Federal Pacific of its rights against the banks. Counsel for both parties agreed to this position on interrogation by the trial court during the course of trial.

There remains for our review only the judgment of the court below dismissing the action brought by Federal Pacific against the banks for clearing the check payable to Loren and Federal Pacific on the endorsement of both names by Loren and the deposit of the check to Loren's account. The lower court did not attempt to resolve the conflicting testi-

mony as to whether Paul had obtained authorization to endorse the check for Federal Pacific. Nor did it decide the issue of whether the July 24th agreement amounted to an accord and satisfaction which would discharge Loren from further payments regardless of whether PBS met its obligation to Federal Pacific to pay to it all further monies otherwise payable to Loren. The court found a more satisfactory basis for its decision in its conclusion that the July 24th agreement amounted to a ratification of Loren's endorsement and deposit of the check, and that Federal Pacific was further precluded from denying the validity of the endorsement by its failure to assert a claim against the banks for a period of some ten months.

Ratification and estoppel, or preclusion, are both recognized as defenses to a suit on an unauthorized signature by the Uniform Commercial Code, 12A P.S. § 3–404, which provides:

1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; . . .

2) Any unauthorized signature may be ratified for all purposes of this Article. Such ratification does not of itself affect any rights of the person ratifying against the actual signer.

An "unauthorized signature" is a defined term in the statute (12A P.S. 1–201) and includes both forgery and an action taken by an agent exceeding his actual or apparent authority. With respect to "ratification", the official comment on the Code states:

"Subsection (2) is new. It settles the conflict which has existed in the decisions as to whether a forgery may be ratified. A forged signature may at least be adopted; and the word 'ratified' is used in order to make it clear that the adoption is retroactive, and that it may be found from conduct as well as from express statements. Thus it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature; and although the forger is not an agent, the ratifi-

cation is governed by the same rules and principles as if he were."

The same commentary states with respect to "precluded" in Subsection (1):

"The words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; and to recognize the negligence which precludes a denial of the signature."

■ The agreement of July 24th plainly amounted to a ratification of Loren's earlier endorsement and deposit of the check. With full knowledge of all material facts, Federal Pacific and PBS negotiated with Loren the terms on which the job should be completed and payments made.

A week later, Federal Pacific informed Fidelity that the parties had reached an agreement and that the bank should release funds to Loren's account as directed in the letter. conspicuously absent was any mention of a claim or even a reservation of rights against either bank. The only reasonable interpretation to be placed on the conduct of the parties is that they had settled their dispute on the basis of commitments which ratified Loren's action.

■ Quite apart from ratification, Federal Pacific is precluded or estopped from asserting a claim against the banks after a delay of ten months in asserting a claim. Had Federal Pacific moved immediately upon receipt of notice of Loren's intended endorsement and deposit, payment on the check might have been stopped at First Pennsylvania, or Loren's account might have been frozen in Fidelity. It made no claim to either bank, but proceeded to work out a settlement of its own without involving the banks. It thereby lost the opportunity of asserting whatever rights it might otherwise have had. *Coffin v. Fidelity-Philadelphia Trust Co.*, 374 Pa. 378, 400–401, 97 A.2d 857, 1953.

Judgment affirmed.