## Huntingdon County v. First-Grange National Bank of Huntingdon

*I. Newton Taylor* and *Robert C. Haberstroh*, for plaintiff.

*Henry & Corcelius* and *Henderson & Terrizzi*, for defendant.

SHEELY, P. J., Specially Presiding, August 13, 1959. —These two actions involve claims in assumpsit filed on behalf of the County of Huntingdon and the Huntingdon County Institution District against the First-Grange National Bank of Huntingdon wherein the respective plaintiffs seek to recover from defendant moneys collected by defendant bank from various drawee banks on which the checks cashed by defendant bank were drawn, it being alleged that said payments were made upon the forced or unauthorized endorsement of plaintiffs thereon.

By agreement of counsel for the respective parties, the two actions were tried before the court without a jury and were consolidated for trial. . . .

### Discussion

The present case arises from the fact that all parties placed confidence in a person who did not merit that confidence. The question presented is, who is to lose as

the result of his defalcations? There are no substantial disputes in the testimony.

Edward Kenneth Fox was employed as Chief Clerk to the Commissioners of Huntingdon County from January 21, 1947, until May 7, 1957, and also served as clerk to the commissioners in their capacity as Commissioners of the Huntingdon County Institution District. During the period indicated, Fox cashed approximately 500 checks belonging either to the County of Huntingdon or to the county institution district, and converted the proceeds to his own use. The present actions are an effort on the part of the commissioners to recover a portion of the amount so converted from the banks which cashed the checks.

From January 3, 1949, to December 8, 1951, the commissioners maintained a bank account in the Grange Trust Company of Huntingdon in the name of "Huntingdon County Commissioners, Huntingdon, Pennsylvania, E. Kenneth Fox, Clerk." This account was opened and maintained by the commissioners for the deposit of taxes collected by them in those taxing districts of the county wherein there was currently no tax collector. Fox was authorized to deposit in this account the taxes so collected and to draw checks thereon for the purpose of distributing the funds to the taxing districts to which they were payable. This account was closed on December 8, 1951, but was reopened on November 12, 1952, for the deposit of Social Security funds representing deductions from the salaries of county employes and payments made by county officials for Social Security tax. The account was carried in the same name as theretofore, and Fox was authorized to make deposits therein and to draw checks thereon only for the purpose of transmitting the Social Security payments.

The commissioners also maintained an account in the First National Bank of Mapleton in the name of

"Huntingdon County Institution District" for the deposit of payments made on account of the maintenance of guests at the Huntingdon County Home. Fox was authorized to deposit in this account all moneys received for that purpose, which consisted of checks payable to, and endorsed in blank by, guests of the county home for Social Security, pensions, etc.; amounts received from other institution districts, guardians or trustees, or from the Commonwealth for the maintenance of guests, which latter checks were payable to the Huntingdon County Institution District or to the Commissioners of Huntingdon County. Fox had no authority to draw checks on this account. From time to time, if the general institution district account needed funds, the commissioners would draw checks on this account to the order of the Huntingdon County Institution District, which checks were to be delivered by Fox to the county treasurer for deposit in the general institution district account.

All moneys coming into the commissioners' office, other than the items above noted, were to be delivered by the chief clerk to the county treasurer for deposit in the appropriate county or institution district account. Fox was authorized by the commissioners to endorse all checks belonging to the county or to the institution district for the purpose of delivering them to the county treasurer. He was furnished with a rubber stamp for this purpose, and for the deposit of money in the two accounts above referred to, which contained the words "Huntingdon County Commissioners, Huntingdon, Pennsylvania, —————————, Clerk". He was not authorized to cash checks belonging to the county, but the rubber stamp contained no words limiting the endorsement for deposit only.

Fox's defalcations were accomplished by endorsing checks coming to the commissioners' office and cashing them at defendant banks. This included the checks

made payable to guests at the county home and endorsed by them in blank and delivered to the commissioners, other checks coming to the commissioners' office payable to the county or to the institution district, and checks drawn by the commissioners on their account at the First National Bank in Mapleton and made payable to the county institution district. The proceeds of these checks were converted to his own use.

The commissioners did not know that Fox was cashing checks and had never authorized him to do so, his authority being limited to endorsing checks for deposit by the county treasurer or in the two bank accounts carried by the commissioners as above noted. The banks had never been notified that Fox's authority was so limited, and the Grange Trust Company held a signature card for the account in that bank showing Fox's signature as being authorized for that account.

Under section 3-404 of the Uniform Commercial Code of April 6, 1953, P. L. 3, 12A PS §3-404, it is provided:

"Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value."

" 'Unauthorized signature' means a signature made without actual, implied or apparent authority and includes a forgery": Section 1-201, 12A PS §1-201.

Under the Uniform Commercial Code Comment, under 12A PS §3-404, it is stated that the term "unauthorized signature . . . includes both a forgery and a signature made by an agent exceeding his actual or apparent authority".

In section 23 of the Negotiable Instruments Law of May 16, 1901, P. L. 194, 56 PS §28, it is provided that: "When a signature is forged or made without the au-

thority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefore, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

Relying upon these statutes, it is the position of plaintiffs that the endorsements upon the checks in question by Fox were unauthorized and that, therefore, defendant acquired no title thereto but title remained in plaintiffs, and that defendant's act in assuming control over the checks and the proceeds thereof constituted a conversion of plaintiffs' property for which it is liable to plaintiffs: Lindsley v. First National Bank of Philadelphia, 325 Pa. 393 (1937).

Defendant contends that, since Fox had authority to endorse the checks in plaintiffs' names, the endorsements were not forgeries and his act in cashing the checks instead of depositing them was merely an unauthorized diversion of funds. Defendant relies upon a number of theories. It contends that Fox had actual authority to cash checks; authority implied from his position as chief clerk in charge of all operations of the commissioners' office; apparent authority from the fact that the commissioners' account at defendant bank was carried in his name as clerk, and he was authorized to use a rubber stamp for endorsement which was not restricted for deposit only; estoppel from the fact that the commissioners created the situation which made it possible for Fox to misappropriate the funds, and that it was a purchaser for value of the checks without notice of Fox's lack of authority.

It seems to us that all of these contentions overlook the one controlling fact of this case. All the cases relied upon by defendant are cases involving business or

banking corporation or individuals. The present case involves public funds and public officers, as to which there are specific statutory provisions and limitations. The General County Law of May 2, 1929, P. L. 1278, provided in section 362 that "It shall be the duty of the treasurer of every county, where the office of controller has not been established, to receive all moneys due or accruing to the county, and to pay the same on warrants drawn by the commissioners."

The County Code of August 9, 1955, P. L. 323, likewise provides in section 1760:

"The county treasurer shall receive and receipt for all moneys due or accruing to the county" (16 PS §1760). Section 1762 of the latter act also provides for the designation by the county commissioners and the county treasurer of a depository or depositories for all county funds and that "withdrawals from such depository shall be only upon properly authorized checks, drawn by the county treasurer".

Section 1751 provides that the commissioners must approve each transaction involving the expenditure of county funds and that the voucher and check therefor shall be drawn by the chief clerk who shall keep files of the bills, claims or demands involved and of the vouchers. The commissioners shall sign the checks either personally or by facsimile, and they shall be forwarded to the county treasurer for his signature. Vouchers must be numbered serially, and every check must bear the same serial number as the voucher. Under section 1760, the county treasurer shall receive and receipt for all moneys due or accruing to the county and shall issue receipts in triplicate for all moneys received, one of such receipts to be transmitted daily to the county commissioners. The receipts shall be serially numbered and shall indicate the amount of money received, from whom, on which account, and the date.

The County Institution District Law of June 24, 1937, P. L. 2017, provides in section 302, 62 PS §2252, that the commissioners of each county shall be the executive and administrative officers of the institution district, and the county treasurer shall be its treasurer. Section 310, 62 PS §2260, provides that the commissioners and the treasurer, as officers of the institution district, shall be subject to the same fiscal supervision and control as are provided by law with respect to county funds.

These statutes provide a definite and carefully worked out system for the handling of county funds using serially numbered receipts, vouchers and checks as safeguards. Accounts and records are required to be kept in the offices of the county commissioners and of the county treasurer and operate as a check against each other. The statutes contemplate no cash transactions and do not permit the expenditure of county funds by either the commissioners or the treasurer without the concurrence of the other. There is no authority whatever for the maintenance of a bank account in the name of the commissioners or of the institution district from which the commissioners themselves, or their chief clerk acting under their authority, may expend county funds without having such funds pass through the hands of the treasurer.

Since all moneys are required to be deposited in the officially named depository and disbursements may be made only by checks signed by the commissioners and the treasurer, there is no authority in anyone, the treasurer, the commissioners or the chief clerk to endorse checks and to receive cash therefor. And, since the commissioners themselves could not cash checks belonging to the county or to the institution district, they could not delegate such authority to their chief clerk, either expressly or apparently, or be estopped to deny the existence of such authority. Officials can rat-

ify only those acts which they themselves are empowered to make: Whiteside v. United States, 93 U.S. 247, 23 L. Ed. 882. Nor could such authority exist by implication by reason of the chief clerk having control of all operations of the commissioners' office. The control of the operations of that office is limited to the proper functions of the office which do not include the cashing of county checks or the expenditure of county funds.

It must be borne in mind that we are not here dealing with individuals in their individual capacity. We are dealing with governmental officials whose authority and duty is prescribed and limited by statute. All persons dealing with such officials are bound to recognize the limitations of authority of such officials: Union Paving Co. v. City of Philadelphia, 263 Pa. 577 (1919). As stated in Bartholomew v. Lehigh Co., 148 Pa. 82, 85 (1892):

"Conceding that the sheriff and county commissioners might, under such circumstances, be estopped as individuals, it does not follow that the taxpayers of Lehigh county are estopped by the unlawful acts, or by the negligence of their officers. This suit is against the county, and the taxpayers are only bound by what its officers have lawfully done." See also Consolidated Dressed Beef Co. v. Philadelphia, 245 Pa. 268, 270 (1914); Kuhn v. Commonwealth, 291 Pa. 497, 502 (1928).

In Luzerne Township v. Fayette County, 30 Pa. 247, 252 (1938), there was a suit on an oral contract made by the commissioners in excess of $100 (the statute required contracts over $100 to be in writing). The court said:

"The doctrine of estoppel is likewise inapplicable. The oral agreement between the Township and the County was invalid because of the statutory law of the State, which was within the cognizance of both parties and which they were equally bound to observe.

A person who deals with a government official is bound to know the limitations of that official's authority and to govern himself accordingly. To weaken this principle would be to render abortive the mandatory requirements of the law in regard to the making of public contracts, and thus to destroy that salutary protection of the people against their own representatives which such legislation is designed to secure."

See 43 Am. Jur. §256, p. 73, where it is stated:

"Everyone is required to take notice of the extent of authority conferred by law on a person acting in an official capacity . . ."

In 8 Am. Jur. §411, p. 149, it is stated:

"Knowledge or notice, actual or constructive, that commercial paper is public property requires one dealing in it to act accordingly, and one purchasing such an instrument from a public officer is chargeable with notice of the lack of authority of the officer to use it for his private purpose."

It follows that defendant bank in this case, although it had no actual notice that Fox was not authorized to cash checks and had no intention of aiding him in perpetrating a fraud on the county, was bound to know that the county treasurer was the only official authorized to receive money due or accruing to the county or the institution district, and that neither the county commissioners nor their chief clerk had authority to cash checks belonging to the county or to the institution district. It, therefore, was bound to know that Fox's endorsement of the checks for the purpose of cashing them was an unauthorized endorsement, and its payment of the proceeds of the checks to Fox was a conversion of funds belonging to the county and to the institution district.

The fact that the practice of the commissioners in maintaining a bank account in their own names, and in permitting Fox to draw checks on one of said ac-

counts, continued for a long period of time does not relieve the bank. In Lawrence County v. Horner, 281 Pa. 336, 342 (1924), the court said:

"Is the county estopped from now objecting to these unlawful allowances merely because for sixty-eight years county treasurers made the same kind of illegal claims, and those whose duty it was to object did not do so. Res adjudicata not being in the way, the question answers itself."

As to the checks payable to guests of the county home and endorsed by them in blank, defendant contends that such checks thereby became bearer instruments and that, since it paid value for the checks without notice, Fox was appropriating the proceeds to his own use, it has a complete defense as to these items. There might be some merit to this contention if the bank did not have knowledge that the checks were the property of the county or of the institution district, but the contention overlooks the fact that before cashing these checks Mr. Fox affixed the rubber stamp endorsement of the county commissioners thereon thereby giving the bank actual notice that the checks were county property. See 8 Am. Jur. §411, p. 149, supra.

Having held that the bank is liable to plaintiffs, one further question arises. When Mr. Fox was confronted with his defalcations, he made restitution on April 18, 1957, of $4,200; on April 25, 1957, of $3,149.70, and on May 25, 1957, of $659.47. These amounts were allocated by agreement between Mr. Fox and the commissioners to checks cashed in the Grange Trust Company in the amount of $5,661.09, Union National Bank and Trust Company of $510.86, the First National Bank of Huntingdon of $325, and cash items not related to banks in the amount of $1,407.20. None of these items has been included in these actions.

At the time that Mr. Fox was sentenced on criminal charges against him, he repaid to the county commis-

sioners the sum of $13,409.53, without specifying the items to which it should be credited. The commissioners allocated this fund: $2,748.68 to checks cashed at the Grange Trust Company; $46.90 to checks cashed at the Union National Bank and Trust Company; $12.66 to checks cashed at the First National Bank of Huntingdon, and $10,601.29 to cash items not related to banks. These items are not included in the present actions, but defendant contends that before any of the items not related to banks, amounting to $10,601.29, could be subject to reimbursement by use of funds paid by Fox, it was incumbent upon plaintiffs to prove that Fox had misappropriated the money with the same particularity that it is called upon to prove the items for which it is making claim against defendant.

The real position of defendant in this connection is that a portion of the claims against it has been paid by Fox. Under the Pennsylvania Rule of Civil Procedure, payment is an affirmative defense and, as such, must be affirmatively pleaded and proved: Pa. R. C. P. 1030; Schmidt v. Paul, 377 Pa. 377, 382 (1954). The institution district pleaded in paragraph 8 of the complaint that "the only credit to which the Defendant is entitled is the sum of $2,748.68 insofar as the former the Grange Trust Company is concerned and $12.66 insofar as the former the First National Bank of Huntingdon is concerned. . . .", to which defendant answered:

"The averments of Paragraph 8 of the Plaintiff's Complaint are denied, and in answer thereto, the Defendant avers that, after reasonable investigation of the credits referred to in said paragraph, the Defendant is without information or knowledge sufficient to form a belief as to the truth of the averments as to the application of the credits, and demands specific proof thereof. And further Defendant avers that no amount is owing by Defendant to the Plaintiff."

In the action by the county, it is alleged in the complaint that "there are no credits, set-offs or defalcations applicable to the said amount."

Defendant denied this allegation and averred lack of knowledge and demanded specific proof. Defendant nowhere affirmatively pleaded payment, and there is nothing in the pleadings to indicate that it questioned the validity of the claims to which the restitution was applied other than its demands for specific proof.

Defendant likewise offered no affirmative proof of payment. It relies entirely upon statements elicited by it from plaintiffs' auditor on cross-examination. He testified that their examination gave them definite proof that the checks comprising the nonbank claims had not been part of the county records and had disappeared, and in most cases they could trace them to Mr. Fox, although he admitted that he did not see the checks and did not know how they were negotiated, or in what manner, or by whom. Mr. Raymond A. English, a county commissioner, testified that the amounts due the county and the institution district were determined by the auditor and that the figure of $10,601.29 represents checks which he never saw, and that he did not know whether Fox negotiated those checks. Mr. Fox was not questioned concerning these items.

We agree with defendant that if the validity of the debts to which plaintiffs allocated the restitution paid by Mr. Fox had been properly questioned, the burden would have been upon plaintiffs to prove the debts and the allocation. The validity of the debts would have been questioned by defendant pleading payment, in answer to which plaintiffs would have filed a reply setting up the allocation of the restitution, to which defendants could have filed a counterreply denying the validity of the debts to which the money was allocated. In Reid v. Wells, 56 S. C. 435, 34 S. E. 401 (1899), it

was held that where a payment is made which defendant contends should be applied to a note and mortgage and which plaintiff contends was applied to an open account, the burden is on plaintiff to prove the account and the application. But here, plaintiff was not put on notice in any way that defendant was questioning the validity of the $10,601.29 claim and, therefore, was not called upon to prove that claim.

There can be no question of the correctness of the application of the original fund paid by Fox, since it was done by agreement between Fox and the commissioners. The general rules applicable to the application of payments are stated in Page v. Wilson, 150 Pa. Superior Ct. 427, 433, 435 (1942), cited with approval in Woods Trust, 350 Pa. 290, 294 (1944):

"The debtor has a right to make the application, in the first instance, and failing to exercise it, the same right devolves on the creditor. When no application is made by either party, the law determines how the payments are to be applied in accordance with equitable rules and principles, and primarily, it deems the payments to have been made in discharge of the earliest liabilities of a running account—each item of credit is applied in extinguishment of the earliest debt items in the account; in other cases, it will apply the payment, when not appropriated by either party, in the way most beneficial to the creditor, that is, to the debt least secured, unless to the prejudice of a surety."

The term "least secured debt" means an admitted or recognized indebtedness or, at least, one whose validity is not contested. It does not contemplate an appropriation by a creditor of money paid by his debtor to a disputed or contested claim, so as to bar the latter of his right to litigate his liability. There would be no equity in that. Such an intention could never have been contemplated when the payment was made. See also Restatement of Contracts §387, p. 729.

In Coffin v. Fidelity-Philadelphia Trust Company, 374 Pa. 378, 404 (1953), it was held that a portion of the funds received by a partnership in partial restitution for defalcations by a partner, without specific appropriation, could be applied by the partnership to valid noncheck claims against the partner and the bank which paid checks on forged endorsements was not entitled to credit against its liability to the partnership for restitution funds thus applied. In that case the bank contended that certain of the noncheck claims were improper and that they should receive credit to the extent of such claims. The court held that "assuming, without deciding," that the bank's position was correct, the amount of valid non-check claims exceeded the amount of the restitution. In Farrel v. First National Bank of Philadelphia, 263 Fed. 778; First National Bank of Philadelphia v. Farrell, 272 Fed. 371 (1920), it was held that in a suit by a depositor against a bank for paying unauthorized checks the bank is not entitled to credit for moneys paid to the plaintiff by its employee to make good other defalcations.

The right to apply payments is one strictly existing between the original parties, and no third person has any authority to insist on an appropriation of the money in his own favor: 40 Am. Jur. §140, p. 812. In Page v. Wilson, supra, it was held that the term "the least secured debt" means an admitted or recognized indebtedness, or at least, one whose validity is not contested. We are here dealing with money paid by E. Kenneth Fox, and he has not disputed the application of such funds or the validity of the debts to which they were applied.

Plaintiffs offered testimony to show the amount of the restitution, how it was applied, and the amount thereof which was credited to the claims against defendant. Under the pleadings, which did not question

the validity of the debts to which the restitution was applied, they were not required to do more. All that the record shows which would tend to indicate that the money was not properly applied is the testimony of Mr. English that he did not see the checks going to make up the sum of $10,601.29, but relied upon the auditor for that figure, and the testimony of the auditor that he did not see the checks and did not know how or by whom they were negotiated, but that his examination of the records gave them definite proof that the checks comprising the nonbank claims had been a part of the county records and had disappeared, and in most cases they could trace them to Mr. Fox. He did not testify how they were able to trace the disappearance of these checks to Mr. Fox, but, at least, the record does not show affirmatively that the restitution was applied to invalid claims and, in the absence of pleadings denying the validity of the claims to which payments were applied, they were not required to go further. We conclude that, under the record in this case, defendant is not entitled to more credit than it has been allowed. Judgment must, therefore, be entered against defendant for the full amount of plaintiffs' claims with interest to date.

### Conclusions of Law

1. The County Commissioners of Huntingdon County and their chief clerk are Government officials whose power and duties are prescribed by statute, and they have no authority other than that specifically granted by statute or reasonably implied therein.

2. Neither the county commissioners nor their chief clerk have authority to endorse checks belonging to the county or to the institution district and to receive cash therefor.

3. There is no implied authority in the chief clerk, by reason of his control over the procedure in the

county commissioners' offices, to endorse checks belonging to the county or to the institution district and to receive cash therefor.

4. Since the chief clerk could have no actual authority to endorse and cash checks belonging to the county or to the institution district, he could not have apparent authority to do so.

5. The act of the chief clerk in endorsing checks in the names of the county commissioners or of the county institution district for the purpose of receiving cash therefor constituted an unauthorized endorsement.

6. The county and the institution district are not estopped to deny the authority of their chief clerk to endorse and cash checks belonging to the county or to the institution district.

7. Defendant bank was not a holder in due course without notice of the lack of authority of the chief clerk as to any of the checks which are the subject matter of these actions.

8. Defendant bank, in dealing with the chief clerk, was bound to recognize the limitations of his authority to endorse checks belonging to the county or the institution district for transmittal to the county treasurer only, and to recognize his lack of authority to endorse checks and receive cash therefor.

9. The act of defendant bank in paying the proceeds of checks belonging to the county and to the institution district to Edward Kenneth Fox and refusing to pay to the county or the institution district the proceeds of said checks received from the drawee banks was a conversion of the funds of the county and of the institution district.

And now, August 13, 1959, the court finds in favor of the County of Huntingdon against First-Grange National Bank of Huntingdon in the sum of $1,728.28, with interest of $300.82 to date, or a total of $2,029.10.

And now, August 13, 1959, the court finds in favor of the Huntingdon County Institution District and against First-Grange National Bank of Huntingdon in the sum of $38,243.85, with interest of $5,640.96 to date, or a total of $43,884.81.

The prothonotary shall file this decision and shall forthwith give notice thereof to the parties or their attorneys, and if no exception are filed thereto within 30 days after service of such notice, judgment shall be entered thereon by the prothonotary.