## Philadelphia Title Insurance Company, Appellant, *v.* Fidelity-Philadelphia Trust Company.

Argued April 28, 1965.   Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Howard Saul Marcu,* with him *Daniel Marcu,* and *Marcu, Marcu & Marcu,* for appellant.

*J. Grant McCabe, III,* with him *L. Carter Anderson, George M. Brodhead,* and *Rawle & Henderson,* for appellees.

OPINION BY MR. JUSTICE COHEN, September 29, 1965:

This is an appeal in an action of assumpsit brought by plaintiff-appellant, Philadelphia Title Insurance Company, against defendant-appellee, Fidelity-Philadelphia Trust Company, to recover the sum of $15,640.82 which was charged against the Title Company's account with Fidelity in payment of a check drawn by the Title Company on Fidelity. The complaint alleged that the endorsement of one of the payees had been forged and that, therefore, Fidelity should not have paid the check. Fidelity joined the Philadelphia National Bank as an additional defendant claiming that if Fidelity were liable to plaintiff, PNB was liable over to Fidelity for having guaranteed the endorsements. PNB joined the Penn's Grove National Bank and Trust Company as a second additional defendant claiming that if PNB were

liable to Fidelity, Penn's Grove was liable to PNB for having cashed the check and guaranteed the endorsements. By way of defense all of the banks asserted that none of them were liable because the issuance of the check by the Title Company was induced by an impostor and delivered by the Title Company to a confederate of the impostor thereby making the forged endorsement effective.

The case was tried before the lower court sitting without a jury. The trial judge found in favor of the Title Company. Exceptions to said finding were sustained unanimously by the court en banc and judgment was entered against the Title Company and in favor of the banks. The judgment must be affirmed.

The pertinent facts are stated by the lower court: "Edmund Jezemski and Paula Jezemski were husband and wife, estranged and living apart. Edmund Jezemski was administrator and sole heir of his deceased mother's estate, one of the assets of which was premises 1130 North Fortieth Street, Philadelphia. Mrs. Jezemski, without her husband's knowledge, arranged for a mortgage to be placed on this real estate. This mortgage was obtained for Mrs. Jezemski through John M. McAllister, a member of the Philadelphia Bar, and Anthony DiBenedetto, a real estate dealer, and was to be insured by Philadelphia Title Insurance Company, the plaintiff. Shortly before the date set for settlement at the office of the title company, Mrs. Jezemski represented to McAllister and DiBenedetto that her husband would be unable to attend the settlement. She came to McAllister's office in advance of the settlement date, accompanied by a man whom she introduced to McAllister and DiBenedetto as her husband. She and this man, in the presence of McAllister and DiBenedetto, executed a deed conveying the real estate from the estate to Edmund Jezemski and Paula Jezemski as tenants by the entireties and also executed the mort-

gage, bond and warrant which had been prepared. Mc-Allister and DiBenedetto, accompanied by Mrs. Jezemski, met at the office of the title company on the date appointed for settlement, the signed deed and mortgage were produced, the mortgagee handed over the amount of the mortgage, and the title company delivered its check to Mrs. Jezemski for the net proceeds of $15,640.82, made payable, as we have already mentioned, to Mr. and Mrs. Jezemski individually and Mr. Jezemski as administrator of his mother's estate.

. . .

"[The Title Company's] settlement clerk, in the absence of Edmund Jezemski at the settlement, accepted the word of McAllister and DiBenedetto that the deed and mortgage had been signed by Jezemski; he himself, though he had not seen the signatures affixed, signed as a witness to the signatures on the mortgage; he also signed as a witness to the deed, and in his capacity as a notary public he acknowledged its execution.

. . .

". . . Paula Jezemski, one of the payees, . . . presented [the check], with purported endorsements of all the payees, at the Penns Grove National Bank and Trust Company in Penns Grove, New Jersey, for cash. Edmund Jezemski received none of the proceeds, either individually or as administrator of the estate of Sofia Jezemski; and it is conceded that the endorsements purporting to be his were forged. The Penns Grove bank negotiated the check through the Philadelphia National Bank, and it was eventually paid by Fidelity-Philadelphia Trust Company, which charged the amount of the check against the deposit account of plaintiff.

. . .

"There is no question that the man whom Mrs. Jezemski introduced to McAllister and DiBenedetto was not Edmund Jezemski, her husband. It was sometime

later that Edmund Jezemski, when he tried to convey the real estate, discovered the existence of the mortgage. When he did so he instituted an action in equity which resulted in the setting aside of the deed and mortgage and the repayment of the fund advanced by the mortgagee."

The parties do not dispute the proposition that as between the payor bank[1] (Fidelity-Philadelphia) and its customer[2] (Title Company), ordinarily, the former must bear the loss occasioned by the forgery of a payee's endorsement (Edmund Jezemski) upon a check drawn by its customer and paid by it. *Provident Trust Company of Philadelphia v. Interboro Bank and Trust Company,* 389 Pa. 548, 133 A. 2d 515 (1957); *Coffin v. Fidelity-Philadelphia Trust Company,* 374 Pa. 378, 97 A. 2d 857 (1953); Uniform Commercial Code—Commercial Paper, Act of April 6, 1953, P. L. 3, §3-404, as amended, 12A P.S. §3-404. The latter provides, inter alia, that "(1) Any unauthorized signature [Edmund Jezemski's] is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying. . . ."

However, the banks argue that this case falls within an exception to the above rule, making the forged indorsement of Edmund Jezemski's name effective so that Fidelity-Philadelphia was entitled to charge the account of its customer, the Title Company, who was the drawer of the check. The exception asserted by the banks is found in §3-405(1)(a) of the Uniform Commercial Code—Commercial Paper which provides: "(1) An indorsement by any person in the name of a named payee is effective if (a) an impostor by use of the

---

[1] " 'Payor bank' means a bank by which an item is payable as drawn or accepted." Uniform Commercial Code—Bank Deposits and Collections, Act of April 6, 1953, P. L. 3, §4-105(b), 12A P.S. §4-105.

[2] " 'Customer' means any person having an account with a bank. . . ." Id., §4-104(e).

mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee; . . . ." The lower court found and the Title Company does not dispute that an impostor appeared before McAllister and DiBenedetto, impersonated Mr. Jezemski, and, in their presence, signed Mr. Jezemski's name to the deed, bond and mortgage; that Mrs. Jezemski was a confederate of the impostor; that the drawer, Title Company, issued the check to Mrs. Jezemski naming her and Mr. Jezemski as payees; and that some person other than Mr. Jezemski indorsed his name on the check. In effect, the only argument made by the Title Company to prevent the applicability of §3-405(1)(a) is that the impostor, who admittedly played a part in the swindle, *did not "by use of the mails or otherwise" induce the Title Company* to issue the check within the meaning of §3-405 (1)(a). The argument must fail.

Outside the Uniform Commercial Code, the impostor doctrine has taken many forms and been based on numerous theories, see Annotation 81 A.L.R. 2d 1365 (1962), all of which, when applicable, place the loss on the "innocent" duped drawer of the check rather than the "innocent" duped drawee or payor. Although one form of the doctrine had existed in Pennsylvania for at least fifty-three years before the adoption of the Commercial Code, see *The Land Title and Trust Company v. Northwestern National Bank,* 196 Pa. 230, 46 Atl. 420 (1900), no case has been found which decided whether or not the pre-Code doctrine would have applied to the instant factual situation—when the impostor, rather than communicating directly with the drawer, brings his impersonation to bear upon the drawer through the medium of the representations of third persons upon whom the drawer relies, in part, in issuing the check. But, regardless of the pre-Code form of the impostor doctrine and its applicability to the in-

stant factual situation, the matter must be decided by statutory construction and application of the impostor doctrine as it now appears in §3-405(1)(a) of the Code.

Both the words of §3-405(1)(a) and the official Comment thereto leave no doubt that the impostor can induce the drawer to issue him or his confederate a check within the meaning of the section even though he does not carry out his impersonation before the very eyes of the drawer. Section 3-405(1)(a) says the inducement might be by "the mails or otherwise." The Comment elaborates: "2. Subsection (1)(a) is new. It rejects decisions which distinguish between face-to-face imposture and imposture by mail and hold that where the parties deal by mail the dominant intent of the drawer is to deal with the name rather than with the person so that the resulting instrument may be negotiated only by indorsement of the payee whose name has been taken in vain. The result of the distinction has been under some prior law, to throw the loss in the mail imposture forward to a subsequent holder or to the drawee. Since the drawer believes the two to be one and the same, the two intentions cannot be separated, and the 'dominant intent' is a fiction. The position here taken is that the loss, regardless of the type of fraud which the particular impostor has committed, should fall upon the drawer."

Moreover, the Legislature's use of the word "otherwise" and the Comment, which suggests that results should not turn upon "the type of fraud which the particular impostor has committed," indicates that the Legislature did not intend to limit the applicability of the section to cases where the impostor deals directly with the drawer (face-to-face, mails, telephone, etc.). Naturally, the Legislature could not have predicted and expressly included all the ingenious schemes designed and carried out by impostors for the purpose of defrauding the makers or drawers of negotiable instru-

ments. Something had to be left for the courts by way of statutory construction. For purposes of imposing the loss on one of two "innocent" parties, either the drawer who was defrauded or the drawee bank which paid out on a forged endorsement, we see no reason for distinguishing between the drawer who is duped by an impersonator communicating directly with him through the mails and a drawer who is duped by an impersonator communicating indirectly with him through third persons.[3] Thus, both the language of the Code and common sense dictates that the drawer must suffer the loss in both instances.

The parties have argued at length respecting the effect that should be given to the "negligence" of the Title Company's settlement clerk. While ascertaining the negligence in each case used to play a significant role in the application of the impostor doctrine, see Annotation, 81 A.L.R. 2d 1365, 1371-1372 (1962), Abel, The Impostor Payee, II, 15, Wis. L. Rev. 362 (1940), such an approach is no longer warranted un-

---

[3] The only judicial construction of the impostor provision of the Uniform Commercial Code that has come to our attention is that set forth by the dissenting minority in *First State Bank of Wichita Falls v. Oak Cliff Savings & Loan Association*, 387 S.W. 2d 369 (Tex. 1965). There the impostor did his impersonation before the officers of one bank upon whom another bank relied when issuing its check to the impostor. There was no direct communication between the impostor and the drawer. The majority held that the case was not within the Texas version of the impostor doctrine. The majority's reason was that the maker had no intention "to pay the flesh and blood person who stood in [the first] bank and whom no official or employee of [the drawer] had ever seen. . . ." Id., p. 375. The Uniform Commercial Code was not adopted in Texas when the case was decided, and the majority made no mention of it. However, it is clear from the structure of §3-405 and Comment 2, quoted in the text, that the Code has rejected the rationale relied upon by the majority. Although not adopted by Texas, the minority would have applied the rule enunciated in the Code and in doing so would have construed it as we have here.

der the Uniform Commercial Code's version of the impostor doctrine. See Leary, Commercial Paper: Some Aspects of Article 3 of the Uniform Commercial Code, 48 Ky. L.J. 199, 222, n. 54 (1960); Annotation, 81 A.L.R. 2d 1365, 1372 (1962). On the other hand, the Code does include a separate provision, §3-406, wherein the drawer's or maker's negligence is quite material to his right to recover. However, it is unnecessary to decide whether that section applies here to defeat the Title Company's recovery since recovery is precluded by reason of the applicability of §3-405.

Judgment affirmed.

Mr. Justice EAGEN and Mr. Justice ROBERTS concur in the result.