**In the Matter of BRISTOL ASSOCIATES, INC., Debtor.**

**Appeal of GIRARD TRUST BANK.
No. 74-1178.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 9, 1974.

Decided Nov. 5, 1974.

As Amended Nov. 25, 1974.

Leon S. Forman, Howard T. Glassman, Wexler, Weisman, Maurer & Forman, Philadelphia, Pa., for appellant.

Lewis H. Gold, Adelman & Lavine, Philadelphia, Pa., for appellee.

Before ALDISERT, ADAMS and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge:

The Court is here asked to determine whether a Pennsylvania lender, who takes as collateral for a loan a security interest in a lessor-borrower's lease and in the rents thereunder, must comply with the filing provisions of Article 9 of the Uniform Commercial Code[1] to perfect its interest against attack by a Receiver in bankruptcy.

In 1969, Bristol Associates, Inc. as lessor, entered into an Agreement of Lease, letting certain store premises for a period of 10 years to the Commonwealth of Pennsylvania, agent for the Pennsylvania Liquor Control Board. Two years later, in 1971, in consideration for a loan, Bristol gave Girard Trust Bank a promissory note and, as security, assigned to Girard its interest in the lease. Girard did not record its security interest in the real estate lease by filing a financing statement under Article 9 or make any other public record of the assignment of the lease.

The following year, in 1972, Bristol filed a petition under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. (1966), and a Receiver was appointed. Apart from the first month's rent from the Commonwealth inadvertently paid to Girard, the Receiver retained all rentals and applied them to Bristol's business operations. Girard thereupon filed a reclamation petition with the Bankruptcy Court to recover the rentals paid to the Receiver under the lease that had been assigned. The Bankruptcy Court denied the petition, and the denial was affirmed by the district court. 369 F.Supp. 1 (E.D.Pa. 1973).

Under section 70(c) of the Bankruptcy Act, 11 U.S.C. § 110, and section 9–301 (3) of the Code, the Receiver assumes the rights of a lien creditor. In this status, the Receiver takes priority over those other creditors of the insolvent debtor who hold unperfected security interests. Unperfected secured parties are relegated to the pool of general creditors.

If the assignment of the lease to Girard is a transaction within the scope of Article 9 and if Girard's interest has not been perfected, then Girard cannot successfully assert its security interest against the Receiver. If, however, the assignment of a lease is excluded from Article 9, the filing and perfection provisions of that Article are not applicable, and Girard's security interest in the lease and in the rents from the lease would not be subordinated to the Receiver.

■ The apposite statutory provisions and official Comment[2] provide:

§ 9–102 Policy and Scope of Article.

(1) Except as otherwise provided . . . in Section 9–104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this State

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property . . . .

(3) The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply.

Comment 4. An illustration of subsection (3) is as follows:

The owner of Blackacre borrows $10,-000 from his neighbor, and secures

---

1. 12A Pa.Stat.Ann. § 9–101 et seq. (1970).

2. The Comments have not been officially enacted into law by the Pennsylvania Legislature and thus are not of binding effect. We note, however, that the Pennsylvania Supreme

Court gives substantial weight to the Comments as evidencing the intended application of the Code. Philadelphia Title Insurance Co. v. Fidelity-Philadelphia Trust Co., 419 Pa. 78, 212 A.2d 222 (1965); In Re Royal Electrotype Corp., 485 F.2d 394 (3d Cir. 1973).

his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this Article applies to. the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage. This Article leaves to other law the question of the effect on rights under the mortgage of delivery or non-delivery of the mortgage or of recording or non-recording of an assignment of the mortgagee's interest. See Section 9–104(j).

§ 9–104. Transactions Excluded from Article. This Article does not apply

. . .

(j) . . . to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder.

Comment 2. The exclusion . . . of leases and other interests in or liens on real estate by paragraph (j) merely reiterates the limitations on coverage already made explicit in Section 9–102(3). See Comment 4 to that section.

█ We are required to apply the law of Pennsylvania to issues such as

the one before us. In Re Royal Electrotype Corp., 485 F.2d 394 (3d Cir. 1973). However, the Pennsylvania courts have made no ruling on the interplay of sections 9–102 and 9–104 to resolve the question whether a real estate lease used as collateral falls within the ambit of Article 9. Therefore, it is incumbent on the federal court not only to apply the relevant state law, but to ascertain what that law, in fact, is.

Our analysis proceeds from the statute. We must give effect insofar as possible to the language and intent of the legislators, giving each section a meaningful interpretation while not eclipsing any other portion of the statute.[3]

The question confronting us here thus becomes whether "an interest in real estate" subsequently employed in a "transaction which is intended to create a security interest" is covered by section 9–102, placing the transaction under the Code, or by section 9–104(j), placing the transaction outside the Code.

The Receiver contends that, when the borrower assigned the lease to the lender, the transaction came within the ambit of Article 9 and its provisions for perfecting security interests. In support of this position, the Receiver advances as a syllogism that Article 9 expressly covers security interests in all personal property; that a lease in Pennsylvania is personal property;[4] and that

---

3. Two situations relating to the present case are specifically addressed by Article 9: In one case the provisions of Article 9 control, in the other case the transaction is excluded from coverage. First, had a borrower, such as Bristol, mortgaged its real property to a bank as collateral for a loan, rather than assigning a lease it held as landlord, the Code, under section 9–104(j), explicitly excludes such transaction from its provisions.

On the other hand, where a borrower holds a promissory note in conjunction with a mortgage of real property and then assigns the note as collateral for a loan by a bank, the provisions of Article 9 govern the transaction. The latter situation is the case which the Code includes in section 9–102, Comment 4. Appellant Girard appears to question even this latter application of the Code. *But see*

P. Coogan, W. Hogan & D. Vagts, 1A Secured Transactions Under the Uniform Commercial Code § 23.11 (1973); Warren, Coverage of the Secured Transactions Division of the California Commercial Code, 13 U.C.L.A.L.Rev. 250 (1966).

4. We assume, arguendo, that a lease in Pennsylvania is personalty. M. Stern, Trickett on The Law of Landlord and Tenant in Pennsylvania 2 (rev. 3d ed. 1972). Case law support for this proposition is scant. *See* Wilford v. Dickey, 196 Pa.Super. 468, 174 A.2d 98 (1961). The characterization of mortgages has been more fully developed; mortgages generally have been held to be personalty in Pennsylvania. Gallagher v. Rogan, 322 Pa. 315, 185 A. 707 (1936); McGlathery's Estate, 311 Pa. 351, 166 A. 886 (1933);

the transaction in question here therefore falls within Article 9 coverage. Section 9–104(j) would, under this analysis, be read narrowly, exempting from Article 9 only those transactions touching on the real estate itself, such as the creation of a lease or mortgage; subsequent uses of the lease or mortgage, "intended to create a security interest," would not be excluded. Under the Receiver's approach the "transfers" excluded from Article 9 by section 9–104 (j) would be only those where no intent to create a security interest was present, for example, transfers of blocks of mortgages and the sale of real estate on which outstanding leases were transferred as part of the sale.

The Receiver would place the lease within the scope of section 9–102, Comment 4, *supra*, asserting that, analogous to the promissory note, the lease evidences an obligation to pay. Although the Receiver concedes that the underlying lessor-lessee contract is excluded from the Code by section 9–104(j), he nevertheless maintains that its use as security could, under a reasonable interpretation of the language, fall within section 9–102(3). If section 9–104(j) is construed narrowly, claims the Receiver, so that the "transfers" it excludes do not cover transfers as security pledges, a consistent reading of the two sections emerges.

Girard argues in opposition that section 9–104(j) explicitly exempts from compliance with the provisions of Article 9 any transfer of an interest in realty, no matter what the purpose. Under this reading of the statute, it becomes irrelevant whether a lease is considered realty or personalty under the state law for other purposes. Even if the lease is deemed personalty, its transfer is claimed by Girard to be the subject of express exclusion from the provisions of Article 9.

Responding to the Receiver's reading of section 9–104(j), Girard suggests that the Receiver would nullify the effect of that section by interpreting it to exclude from Article 9 only transactions which that Article does not purport to cover, namely, real property transactions and transfers where there is no intent to create a security interest. Girard contends that a proper reconciliation of the two sections results only from interpreting section 9–104(j) to exclude from Article 9 transactions that would otherwise fall within it, such as the transactions involved in the present litigation.

■ The evolution of the Code since its original enactment, the views of authorities and the realities of the pertinent business practices have persuaded us that the intent of the Legislature was to exclude from the filing and perfection provisions of Article 9 the use of a lease as collateral for a loan.

Sections 9–102 and 9–104 have both been amended since their original enactment. Together, the amendments limit the application of section 9–102 where transactions touch realty and, simultaneously, provide greater explicitness in section 9–104(j), exempting both the creation and transfer of interests in realty. The amendments were proposed in order to clarify the Code as ambiguities in language became evident, rather than to alter the direction or scope of the Code.[5]

As originally enacted in Pennsylvania, section 9–102 did not contain subsection (3).[6] In 1959 subsection (3) was added, accompanied by the explanatory Comment 4.[7] Since the effect produced by Comment 4 was not clear, the Conference of Commissioners on Uniform State Laws and the American Law Institute recommended, in 1962, that the Comment be modified. Before and after the

Equitable Trust Co. v. Schwebel, 40 F.Supp. 112 (E.D.Pa.1941).

5. 1956 Recommendations of the Editorial Board of the Uniform Commercial Code 257– 58; Report No. 1 of the Permanent Editorial

Board of the Uniform Commercial Code, in 1962 Uniform Commercial Code Official Text with Comment.

6. Act of April 6, 1953, P.L. 3 § 9–102.

7. Act of Oct. 2, 1959, P.L. 1023 § 9.

amendment, the relevant portion of Comment 4 read:

> However, when the mortgagee in turn pledges this note *and mortgage* to secure his own obligation to X, this Article is applicable to the security interest thus created in the note *and the mortgage* [which is a security interest in an instrument even though the instrument is secured by a real estate mortgage]. (Emphasis indicates the relevant 1962 deletions; brackets indicate the relevant 1962 addition.)

The changes in wording produced two effects. First, deletion of the references to mortgages distinguishes between the pledge of a note, a separate and distinct contract, and the underlying real estate mortgage. Where a promissory note and mortgage together become the subject of a security interest, only that portion of the package unrelated to the real property is now covered by section 9–102. Second, the added language makes explicit that the promissory note itself falls within the scope of Article 9 by virtue of its status as an instrument.[8] Since a lease of real property is clearly not an instrument, inclusion of its assignment in Article 9 by reason of analogy to the promissory note would be strained. The amendments clarify the rationale of applying Article 9 to the promissory note. They refute the possibility that Article 9 reaches out to encompass every transaction colorably included under section 9–102.

The amendments made to section 9–104 lend further support to the position that the legislators did not intend to include in Article 9 the assignment of a real estate lease. As originally enacted, the Code did not contain section 9–104(j); rather, section 9–104(b) excluded from Article 9 coverage "a landlord's lien or a lien on real estate." Act of April 6, 1953, P.L. 3, § 9–104. Following the recommendation of the Permanent Editorial Board of the Uniform Commercial Code, the Legislature in 1959 adopted the language presently set forth in section 9–104(j). Act of October 2, 1959, P.L. 1023 § 9. The change was promoted by the Board in the interest of "greater clarification and precision as to the types of transactions entirely excluded from the operation of Article 9." 1956 Recommendations of the Editorial Board for the Uniform Commercial Code, 257–58. The language of section 9–104(j) substantially broadens the earlier exclusion by providing that Article 9 does not apply to "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder."

Our conclusion, that lenders need not conform to the requirements of Article 9 in order to retain their security interest in a real estate lease assigned to them as collateral, is supported, apparently unanimously, by authorities who have considered this problem. Included are many of the persons responsible for the drafting of the Code and its subsequent revisions.[9] Carl Funk, a leading expert on the Code and its application in Pennsylvania, stated that "a bank lending on the security of an assignment of a lease or of the rentals payable by the tenant need not comply with the Code in any way."[10]

In their treatise, Coogan, Hogan & Vagts first aver that a promissory note when used as collateral is covered by the Code even if secured by a mortgage, citing section 9–102(3) and Comment 4.

---

8. "Instrument" is defined for purposes of Article 9 as "a negotiable instrument, or a security or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease. . . ." 12A Pa.Stat.Ann. § 9–105(g) (1970) (cross references deleted).

9. Generally the opinions of these authorities are predicated on what is purported to be the "intent of the clear and explicit language" of § 9–104(j). Little, if any, attempt has been made to explain why this interpretation, giving a broad reading to § 9–104(j) and a narrow reading to § 9–102(3), is warranted.

10. This statement is found under the subsection "Loans Secured by Other Types of Personal Property." Banks & the Uniform Commercial Code, 60, 61 (2d Ed. 1964).

However, they continue by asserting that, "[t]hough estates for years are for some purposes considered personal property, the Code would not seem to cover the mortgage of a lease on realty." 1A Secured Transactions under the Uniform Commercial Code § 16.04[1] at 1698 (1973). The authors cite section 9–104 (j) for this proposition. The notion that the assignment of a lease or of rents thereunder as collateral might be considered a security interest in personal property controlled by Article 9 is dismissed as "unduly fearful." The authors state that "[t]he clear intent of section 9–104(j) * * * would be completely nullified" by such an interpretation.[11]

These views of the authorities in no way bind this Court nor are they determinative of the intent of the legislators who enacted Article 9 into law. Nonetheless, the composite picture is suggestive of what the experts expected to be the effect of section 9–104(j). The legislators could not have been wholly unmindful of the views of authorities in the areas affected by the Code. Had the legislators intended a different effect for the language, they might well have given some indication of this. That they did not is surely some evidence that the intended scope of section 9–104(j) was not in sharp contrast to what was generally believed to be its ambit by the leaders in the field. Therefore, a broad reading of section 9–104(j) which would exclude the present transaction from Article 9 is consistent with the views of the authorities and is not controverted

by an indication from the legislators that these views are mistakenly held.

■ One final consideration buttresses the conclusion that the lease when used as collateral should be exempted from Article 9. The universal practice of Pennsylvania lenders in these circumstances is to ignore any application of the Code to leases received as collateral. A bank often takes an assignment of a lease or the rents due under a lease as security for a loan. C. Funk, Banks and the Uniform Commercial Code 61 (2d ed. 1964). Collateral of very substantial value is involved in such loans, which are granted regularly and repeatedly in the world of finance. Parties to these loans "are apt to think for good reasons that they are outside the scope of Article 9." Hawkland, 77 Com.L.J. 79, 84 (1972).[12]

While a uniform trade practice does not constitute proof that the legal consequences of the practice are what those in the field take them to be, neither can it be assumed that a legislature which passed the Code and which has considered and passed amendments to it on several occasions would let stand practices or beliefs which it disapproved. In fact, the amendments passed by the Legislature have tended in the other direction, restricting the application of Article 9 when transactions touch real property. (*See* discussion *supra*.)

■ Where language is susceptible of two reasonable meanings, a court, in the commercial field, should choose that interpretation which comports with cur-

---

11. However, out of an abundance of caution, the authors recommend clarification of the language by revision. Section 23.11[6] at 2401. *Accord*, Coogan, Kripke & Weiss, The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses and Participation Agreements, 79 Harv.L.Rev. 229, 268 (1965).

*See also* Warren, Coverage of the Secured Transactions Division of the California Commercial Code, 13 U.C.L.A.L.Rev. 250 (1966). Professor Hawkland also has noted the confusion inadvertently generated by the language

of §§ 9–102 and 9–104. The Proposed Amendments to Article 9 of the U.C.C.—Part IV: The Scope of Article 9, 77 Com.L.J. 79 (1972). Convinced that no one in the lending field intended the pledge of a realty lease to fall within Article 9, Professor Hawkland proposes further amendments to the Code to clarify the matter.

12. It was suggested at oral argument without contradiction that lenders believe they are excluded because "literally hundreds of opinion letters" from attorneys have so informed the banking community.

rent universal practice in the business world.[13]

It is argued that by dovetailing the two sections to achieve a wider reach for section 9–104(j) and a resultant narrower scope to section 9–102, sufficient heed is not given to the admonition that the Code be "liberally construed and applied to promote its underlying purposes and policies." 12A Pa.Stat.Ann. § 1–102 (1970). Although the conclusion reached today eliminates from Article 9 a class of secured transactions, it nevertheless would not appear to conflict with the self-proclaimed purposes of the Code, which are generally to "simplify [and] clarify" commercial law, to "permit the continued expansion" of commercial life and to "make uniform" commercial law throughout the United States. Section 1–102(2).[14]

Admittedly, a principal function of Article 9 is to achieve maximum benefit for creditors from the notice-filing provisions. The goal of the filing system is to make known to the public whatever outstanding security interests exist in the property of debtors.[15] Once a transaction falls within the Code, this legislative intent must be given full force in any determination of how the Code applies in a situation. The notice requirements are at the core of Article 9. In re Middle Atlantic Stud Welding Co., 503 F.2d 1133 (3d Cir. 1974).

13. Were this Court to interpret the statute so as to require compliance with Article 9 whenever a lease is utilized as collateral, the status of all such leases presently held as collateral would be called into question. Unresolved issues would generate additional litigation. Under the Code, filing would likely be required to perfect the security interest against attack from lien creditors. 12A Pa. Stat.Ann. §§ 9–301, 9–302(1)(e), 9–304 (1970). Undertaking at this time to file all outstanding security interests in leases would be time-consuming and expensive for the secured parties. Assuming, arguendo, that such ruling applied retroactively, the interest of a lender in a lease would be subordinated to any competing claim perfected before the date of filing. 12A Pa.Stat.Ann. § 9–312(5) (a) (1970).

Also, if this Court were to infer the state legislative intent incorrectly, it would appear to create far less dislocation and interim confusion for the state to correct the present holding than to correct a contrary result. The chaos in business affairs precipitated by a result different from that reached here today would seem ill-advised absent stronger indications that such a result was intended by the Legislature.

14. Cases from other jurisdictions have been examined in an attempt to achieve a uniform rule, or to benefit from whatever light has been shed on this issue elsewhere. However, no clear or uniform result emerges. Two appellate state courts have held that leaseholds are excluded from Article 9 by reason of section 9–104(j). In Hilst v. Bennett, 485 P.2d 880 (Colo.1971), a leasehold which a judgment creditor attempted to attach was found outside the scope of Article 9, but the factual discussion does not make clear whether the judgment debtor is the lessor or lessee of the leasehold. In.Ingraham v. Ingraham, 527 P.2d 254, 14 U.C.C.Rptr. 1043 (Kan.1974), a security interest in an oil and gas leasehold was held not governed by the Code. In addition, the Attorney General of Maryland has issued an opinion which takes the official position that a secured transaction such as that before us is not controlled by Article 9. 2 U.C.C. Rptr. 44, 108, Feb. 20, 1964, May 20, 1964.

Coming to a contrary conclusion are two decisions from intermediate state courts, both dealing not with leases but with land-trust agreements. In Levine v. Pascal, 94 Ill.App. 2d 43, 236 N.E.2d 425 (1968), a land-trust agreement was used as collateral for a loan. A subsequent judgment creditor of the debtor sought to reach the land trust. The court held that as personal property the trust was subject to the Code and, as it was not perfected by filing, it could be reached by a judgment creditor. In Riebe v. Budget Financial Corp., 264 Cal.App.2d 576, 70 Cal.Rptr. 654 (1968), it was the lender who urged that the Code covered the transaction. A broker of notes secured by deeds of trust was successful in arguing that because the notes were personal property covered by the Code, the lender was exempt from the state usury laws, which did not apply to Code transactions. Since it was the notes rather than the trust deed which were used as collateral, Riebe appears directly within Comment 4 to section 9–102. The result in Riebe is thus not contrary to the conclusion reached here.

15. 12A Pa.Stat.Ann. §§ 9–101, 9–104, and Comments thereto (1970). P. Coogan, W. Hogan & D. Vagts, 1 Secured Transactions Under the Uniform Commercial Code 461 (1973).

In ascertaining whether including or excluding a transaction for Article 9 conforms to the legislative intent, however, we must weigh the interest in public notice against the other purposes of the Code, such as uniformity and the promotion of commercial law, and interpret the statute in the light of current commercial and banking practice. On balance, this Court concludes that the drafters who wrote Article 9 and the legislators who enacted it into law intended section 9–104(j) to be interpreted sufficiently broadly to exclude the assignment of a lease and rents thereunder from the operation of Article 9. The burden of those who would propound a different view is to persuade the State Legislature. We should not usurp the legislative function.

The decision of the district court will be reversed, and the case will be remanded for entry of an order consistent with this opinion.