404 F.Supp. 1188 (1975)
UNITED STATES of America, Plaintiff,
v.
PS HOTEL CORP. et al., Defendants.
No. 73-114C(2).
United States District Court, E. D. Missouri, E. D.
March 11, 1975.
Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., for plaintiff.
Henry F. Luepke, Jr., Daniel Reardon, Jr., St. Louis, Mo., Michael M. Flavin, Clayton, Mo., for defendants.

MEMORANDUM AND ORDER
REGAN, District Judge.
This case, tried to the Court, arises out of a defaulted loan in the original sum of $150,000 which was made by First State Bank & Trust Company (First State) to Parkway Operating Company (Operating) on October 28, 1971, the loan being 90 per cent guaranteed by the Small Business Administration (SBA). Realistically, the loan was doomed to default from its inception.
In conjunction with the loan, Operating executed and delivered a note in the amount thereof together with agreements granting to First State security *1189 interests in the motel furniture, fixtures and equipment in the Parkway House Airport Hotel (motel) and its inventory and accounts receivable. In addition, Operating executed and delivered to First State financing statements covering the property referred to in the security agreements and these statements were duly filed with the Recorder of Deeds and the Secretary of State of Missouri no later than October 28, 1971.
Operating is a Missouri corporation organized in May, 1968. As of the following month, its stock was owned (533 1/3 shares each) by Charles W. Cole (Cole), its president, defendant Robert Seavey (Seavey), vice-president and director, and Sol Pottish (Pottish), another vice-president, secretary and director. As of February, 1971, Seavey and Pottish transferred to Cole their entire interests in Operating and they resigned as officers and directors. Thereafter, Cole had sole ownership, control and management of Operating and he alone negotiated (as well as personally guaranteeing) the Small Business Administration loan made by First State. The expressed purpose of that loan was to spend $100,000 to redecorate and refurbish the motel and to use $50,000 as working capital.
First State's relationship with the motel property long antedated the incorporation of Operating. It had made the construction loan for the building, but problems resulting from the death of the builder made it necessary for First State to take over the completion of the building, which it then sold to Airshel, Inc. taking back a second deed of trust subject to existing deeds of trust, which were held by Community Federal Savings & Loan Association (Community), aggregating in excess of two million dollars.
Airshel's operation of the motel proved unsuccessful, and it conveyed the project in January, 1968, to Stam Hotels, Inc. (Stam), a corporation which State Bank organized for the purpose of holding title to the motel. Cole was then the manager of the motel, and Stam continued his employment as such. In May, 1968, Stam sold the motel property to Thirty-Five Hundred North Lindbergh Corporation (Thirty-Five Hundred), a corporation organized by Cole earlier that month. No money changed hands. Thirty-Five Hundred executed a purchase money note to Stam for approximately $750,000 and a security agreement. Thereby, Stam acquired a security interest in the furniture, furnishings, fixtures, equipment and supplies of the motel. Immediately after that sale was closed, on May 31, 1968, Thirty-Five Hundred transferred the motel property to Parkway House Associates (Associates), a limited partnership which had been formed four days earlier for the purpose of acquiring and leasing the motel. The general partner, Motor Hotel Management, Inc. (Motor Hotel) was a Missouri corporation organized in May, 1968, by Cole, Pottish and Seavey, with Pottish and Seavey as limited partners and Motor Hotel as general partner.
Upon acquiring ownership of the motel, Associates then leased the property (subject to the deeds of trust) together with all the furniture, furnishings, fixtures, equipment and supplies to Operating, the lease being signed by Cole for Associates and by Pottish, as vice-president, for Operating. The lease contained a provision to the express effect that the furniture, fixtures and supplies covered by the lease were and would remain the sole property of the lessor. Cole was immediately employed as manager of the motel. By an agreement purportedly made as of January 1, 1971, but not executed until September, 1971, the limited partnership agreement was amended by admitting G-S Hotel Corporation (organized in September, 1971) as a general partner. The amended partnership agreement also increased to 33½ per cent the interest of Motor Hotel in the partnership.
By another document made as of January 1, 1971, but not executed until September 11, 1971, the lease to Operating *1190 was amended in a number of respects, one of which was an assignment to the lessor (in the event of default) of the "rents, issues, income and profits" arising from the operation of the motel. This lease amendment was duly recorded prior to the making of the SBA guaranteed loan. The application for that loan was made October 4, 1971, and during the time it was being negotiated First State had in its possession copies of the lease agreement and the lease amendment between Associates and Operating, and the various deeds of trust and security documents theretofore executed.
Operating became in default under the lease, and as of 12:01 A.M., June 8, 1972, Associates terminated the lease and through its general partner G-S Hotel Corporation took possession of the motel premises which it immediately leased to defendant PS Hotel Corporation (PS), a Missouri corporation which was incorporated by Pottish and Seavey on May 30, 1972. Defendant F. Lee Paul (Paul) was employed as manager of the motel.
The action is in four counts, the fourth count having been added by amendment to the original complaint. In the fourth count, judgment for the full amount owing on the note was prayed against Associates, G-S, PS, Pottish and Seavey, on the theory that these defendants were partners for the purpose of owning and operating the motel, that Operating was a mere instrumentality and alter ego of Associates, and that the loan evidenced by the note held by plaintiff was made by Operating as agent of and for the interest of Associates and that Associates, Motor Hotel, Cole and Operating were under the complete control of Pottish and Seavey.
There is no credible evidence to support the count four claim. It is clear from the evidence that the only partnership was the limited partnership which owned the motel property. Operating was a separate legal entity, as was Motor Hotel. The mere fact that initially two of the limited partners, Seavey and Pottish, were also stockholders and officers of Operating did not result in the creation of a partnership relation between them (or Associates) and Operating. So, too, the fact that Cole (who together with his son) owned all of the stock of Motor Hotel (the general partner in Associates) did not operate either in law or in fact to make Pottish, Seavey, Associates, or any of them, partners of Operating. Unquestionably, the parties knowledgeably and intentionally spelled out their precise relationships in the documents which they prepared and executed, as well as in their subsequent conduct. From its incorporation and at all times thereafter, Operating was intended to be and was a separate, independent, corporate entity, and in no sense of the word was it an instrumentality or alter ego of Associates, Pottish, Seavey, or any of them.
Moreover, First State was fully aware, from the very inception of the loan transaction, that Cole was the sole moving party in seeking the loan, and that Cole alone had the ownership, control and management of Operating, the prospective borrower, both at and after the time Cole negotiated for the loan. There is an entire want of any evidence that Pottish, Seavey, Associates or G-S held out or represented, by words or actions, to First State (or to SBA) that Operating was their agent, partner or instrumentality, and PS was not even in existence at the time the loan was made.
It was not until after First State, at the instance of SBA, in October, 1971, requested Associates, through Pottish and Seavey, to consent (as lessor) to the assignment of the lease to First State as collateral security for the loan, that these defendants were apprised of the fact that a loan for Operating was being negotiated by Cole. The proceeds of the loan were received by Operating and were expended by Cole as he saw fit without consulting any defendant. It is further significant that sometime before Cole negotiated the First State loan for Operating, Pottish and Seavey had, to *1191 the knowledge of First State, disposed of all their interests in Operating, and that thereafter, neither Pottish nor Seavey was a stockholder or officer of that company. And First State was further aware that Pottish and Seavey would not have agreed to have become personally liable on any obligation incurred by Operating or Cole. Hence, under any view of the facts in evidence, plaintiff may not recover on count IV.
The remaining counts, I, II and III, may be treated together. The basic issue involved in those counts is that of priority with respect to the rights of the parties in the inventory, the accounts receivable, and the furniture and fixtures of Operating at and after the time its lease was terminated.
The initial question is that of title to the assets in question. At the time Associates leased the motel to Operating the "furniture, fixtures and supplies" which were then used in connection with the operation of the motel business were owned by Associates (subject to Community's deed of trust and Stam's security interest). The lease included not only the real estate but also the "furniture, fixtures and supplies" owned by Associates. Under these facts, it is self-evident that Operating could not give First State a security interest in the leased personal property which would be superior to Associates' ownership interest therein. And it is equally obvious that plaintiff's rights in the leased personal property can be no greater than were those of First State.
However, it would appear that what are involved are not the "furniture, fixtures and supplies" which are referred to in the lease. There is no evidence that any items of furniture, fixtures and supplies other than those owned by Associates and leased to Operating, and other than the Motorola television sets and stands (as to which plaintiff has abandoned its claim) either came into possession of any defendant or were acquired with the proceeds of the First State loan. Hence, under the evidence there is no basis for ordering defendants to account to plaintiff with respect thereto.
Different considerations apply to the food and liquor inventory and to the accounts receivable which were owing to Operating at the time it was evicted. The security agreements executed by Operating gave First State a security interest in the inventory and accounts receivable. In spite of general assertions by defendants to the effect that Operating's inventory was owned by Associates, we have been cited to no document or other evidence to support this contention. The lease is explicit in stating what was leased to Operating and the words used in that connection are defined. The words "furniture, fixtures and supplies" are defined as meaning "all furniture, furnishings, trade and other fixtures, equipment, appliances, air conditioning and heating units, television sets and stands, chinaware, glassware, silverware, linens, draperies, curtains and similar items." Obviously, the food and liquor inventory is neither furniture nor fixtures, and there is nothing in the definition of "supplies" which could conceivably apply to the food and liquor inventory.
Even if the original merchandise inventory at the motel as of May 21, 1968 (the date of the lease) may have been acquired by any of defendants or their predecessors, there is not a scintilla of evidence (or even a contention) that such was the inventory which Operating had on hand either at the time the security interest was granted to First State or when the lease was terminated. We hold that the food and liquor inventory as of June 8, 1972 was not part of the property leased to Operating, but was owned by Operating and was covered by the security documents it executed in favor of First State. Defendants took possession of that inventory and converted it to their own use. Hence, defendants must account to plaintiff for the food and liquor inventory or for the reasonable value thereof. We find that *1192 the value of the inventory was $1,000 for the food inventory and $2,000 for the liquor inventory.
Somewhat different considerations apply to the accounts receivable. Admittedly, by the time of trial there had been collected the sum of $24,707.28 on said accounts receivable. By way of defense, it is asserted that Associates had a prior lien on the accounts receivable based on the lease amendment which was executed September 11, 1971 (thus antedating the loan), by which Operating purported to assign to Associates the "rents, issues, income and profits due and to become due from any sublease, subletting or other use of any room or space in the demised premises or from any concession therein, or arising out of the operation of the demised premises or the hotel business conducted therein or any part thereof."
Although the lease amendment was filed and recorded in the Recorder of Deeds Office for St. Louis County on September 30, 1971, the provisions of the Secured Transactions Article of the Uniform Commercial Code were not complied with. The lease amendment does not qualify as a financing statement and was not filed as one. However, defendants contend that under Section 400.9-104, R.S.Mo., it was not necessary to comply with the Secured Transactions Article. Section 400.9-104 excludes from the Secured Transactions Article various listed transactions, one of which is "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder."
Defendants have cited us to no case which construes this section, particularly as applied to a pledge of accounts receivable of a motel or hotel business to secure payments due under a lease. In our judgment, the statutory exclusion was not intended to apply to such accounts receivable, and the language of the statute cannot reasonably be construed to include them. This case does not involve an instrument conveying an interest in or lien on real estate. And as concerns the words "rents thereunder," what is referred to are the rents payable to the lessor under the provisions of a lease, not charges made by the lessee for services it provides to its patrons, even though those services include furnishing rooms in the leased premises for the use of its guests. Hence, the mere fact that the lease and lease amendment were recorded as instruments affecting real estate does not affect the priority of plaintiff's security interest in the accounts receivable.
The further contention is made that First State had at least constructive notice of the lease amendment as well as of the provisions of the lease itself, so that plaintiff standing in the shoes of First State may not insist that it had a priority right to the accounts receivable. We do not agree. No financing statement was filed at all by Associates, thereby distinguishing this case from those where a filing is made in good faith in an improper place or in less than all of the places required. Plaintiff's lien is unaffected by any knowledge First State may have had of the lease amendment.
So, too, defendants' reliance upon the "good faith" requirement of Section 400.1-203 R.S.Mo. is misplaced. Therein, it is provided that "(e)very contract or duty within [the U.C.C.] imposes an obligation of good faith in its performance or enforcement." We find no bad faith on the part of First State, and certainly none on the part of the SBA, in obtaining the security interests in Operating's assets without which the loan would not (and could not) have been made. Moreover, by reason of the borrowed money, improvements were made to the motel which benefited Associates.
The evidence shows that defendants, upon collection of the accounts receivable, paid out most of the proceeds to creditors of Operating, although it is clear that many of the payments were made for defendants' benefit, to induce such creditors to continue to do business with the new operation which defendants *1193 had set up on the premises. Included in such payments were one to First State for $1,179.24 due for laundry equipment on which First State held a security interest, two payments aggregating $2,044.96 on account of telephone bills, one for $440.96 for a water bill, another for $360.00 for legal fees, and several to unions. There was even one payment of $500 to a political campaign committee. Nevertheless, defendants had no right to destroy plaintiff's security interest in the accounts receivable and must be held to account to plaintiff therefor.
Having sustained plaintiff's priority with respect to the merchandise inventory and the accounts receivable, it is unnecessary to rule plaintiff's alternative Count III claim bottomed on §§ 191 and 192, 31 U.S.C. We note, however, that § 191, granting priority to debts due the United States, by its terms applies (other than to the estate of a deceased debtor) only if an insolvent debtor either commits an act of bankruptcy or makes a voluntary assignment of his assets or if the property of an absconding, concealed or absent debtor is attached by process of law. No evidence was adduced to show that any of the events giving rise to a § 191 priority has occurred.
It is clear from the evidence that all defendants participated in the conversion of the merchandise inventory and the accounts receivable. Pottish and Seavey directed the take-over and the disposition of these items and may not escape liability on the premise that they were acting as agents of Associates. So, too, Paul although more peripherally involved than the other defendants, may not defend on the premise that he was a mere employee. All who participated in the conversion are jointly liable therefor.
Accordingly, we hold that defendants are liable to plaintiff for the food and liquor inventory and for the accounts receivable which they converted. Judgment will be entered in favor of plaintiff and against defendants on Counts I and II in the aggregate amount of $3,000 for the food and liquor inventory and $24,707.28 for the accounts receivable, or the total sum of $27,707.28 together with interest thereon at the rate of 6% per annum from June 8, 1972, and in favor of defendants on count IV.
The foregoing memorandum constitutes our findings of fact and conclusions of law.