METROPOLITAN LIFE INSURANCE COMPANY, APPELLEE AND CROSS-APPELLANT, V. REEVES-GUSTAFSON, A NEBRASKA GENERAL PARTNERSHIP, ET AL., APPELLEES, COMAG CREDIT CORPORATION ET AL., APPELLANTS AND CROSS-APPELLEES.

422 N.W.2d 72

Filed April 15, 1988.   No. 86-352.

Richard E. Putnam of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellants.

Daniel M. Placzek of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, for appellee Metropolitan Life Insurance Company.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

Boslaugh, J.

This action was commenced by the plaintiff, Metropolitan Life Insurance Company (Metropolitan), for declaratory relief to determine the rights of the parties to the proceeds from a part of the crops grown on land in Wheeler County, Nebraska, owned by Lawrence Reeves, Philip Gustafson, and their spouses (Reeves-Gustafson). Both Metropolitan and the defendant Omaha National Bank claim priority to the proceeds, which have been paid into the district court.

The land involved in this action consists of three tracts, which, for convenience, will be referred to as parcels 1, 2, and 3.

In December 1980, Reeves-Gustafson executed and delivered to Metropolitan promissory notes in the amounts of $475,000 and $325,000, secured by mortgages upon parcels 1 and 2. The mortgages, which were recorded on December 19, 1980, contained the following clause:

> And it is further agreed that in case of a default in the payment of the said principal Note or interest, or any part thereof, as it shall mature, or in case of failure to keep or perform any of the covenants or agreements contained in this indenture, then the second party; its successors or assigns, shall be and is hereby authorized and empowered to take immediate possession of the said premises hereby conveyed and all crops thereon, or to collect the rents therefrom, and apply the proceeds thereof to the payments of the debt hereby secured.

From 1980 to 1983 Reeves-Gustafson executed a series of promissory notes to Commercial National Bank and Trust Company of grand Island and Comag Credit Corporation to obtain operating funds. On Janaury 20, 1983, Reeves-Gustafson executed a promissory note to Commercial National in the original principal amount of $305,719.49. This note was secured by a security agreement dated June 21, 1982, in which Reeves-Gustafson granted an interest in, among other collateral:

> Whether now owned or hereafter acquired by Reeves-Gustafson, all equipment, including but not limited to all farm equipment, tractors, machinery and implements; all farm products, including but not limited

to crops, livestock and supplies used or produced in farming operations; all contract rights and accounts; and any additions, accessions and substitutions thereto; and all products and proceeds thereof.

The crops in the above were on parcels 1, 2, and 3. This interest was properly perfected.

Reeves-Gustafson executed four notes to Comag as follows: (1) on January 25, 1980, in the original principal amount of $136,000; (2) on June 8, 1981, in the original principal amount of $90,076; (3) on June 7, 1982, in the original principal amount of $153,700; and (4) on March 29, 1983, in the original principal amount of $31,000. To secure these obligations, Reeves-Gustafson and Comag entered into security agreements dated April 23, 1980, and June 1, 1981. Among other collateral, Reeves-Gustafson granted Comag a security interest in all of the crops growing or to be grown on parcels 1 and 2, which was properly perfected.

As of January 14, 1986, there was due and owing to Commercial National the amount of $104,311.97 and accrued interest in the amount of $113,132.79. Interest has continued to accrue at the rate of $42.15 per day. As of the same date, there was due and owing to Comag the total principal sum of $331,562.12 and accrued interest in the amount of $183,902.05. Interest has continued to accrue at the rate of $119 per day.

As of January 14, 1986, Reeves-Gustafson was in total default of the combined sum of $416,830.22 under the two mortgages to Metropolitan. Petitions to foreclose the two mortgages were filed by Metropolitan on March 10, 1984.

Because the assets of Commercial National and Comag have been sold to the Omaha National Bank, and it has succeeded to all of the rights of both Commercial National and Comag, Omaha National will be referred to as the defendant.

On April 19, 1984, Reeves-Gustafson leased parcels 1, 2, and 3 to Reginald Dobson and Sons, Inc. (Dobson). The lease on parcels 1 and 2 provided Dobson was to pay 35 bushels of corn per acre as rent. Dobson also agreed to pay rent in the form of crops from parcel 3, but the record does not show the amount to be paid.

During 1984 Dobson grew crops on parcels 1, 2, and 3, which

were harvested in the fall of 1984. Pursuant to the leases, the corn due Reeves-Gustafson was delivered and sold to United Grain Corporation. A check in the amount of $118,192.14, plus the interest thereon, represents the proceeds from the sale of crops due Reeves-Gustafson. Of that amount, $72,192.68 is attributable to parcels 1 and 2.

The trial court found that Metropolitan, by virtue of its mortgages, was entitled to the crop proceeds attributable to parcels 1 and 2 and that Omaha National had a first lien on the portion of crop proceeds attributable to parcel 3. Omaha National has appealed and claims that it is entitled to the proceeds from parcels 1 and 2. Metropolitan has cross-appealed and claims that it is entitled to one-half of the proceeds from parcel 3.

It is undisputed that the funds in controversy are rents which are due Reeves-Gustafson under the leases to Dobson. Omaha National claims the proceeds from the crops on parcels 1 and 2 by virtue of its perfected security interest in crops. Metropolitan claims the proceeds from the crops on parcels 1 and 2 under the assignment of rents clause in its mortgages, which provides that in the event of default, Metropolitan is "authorized and empowered to take immediate possession of the said premises hereby conveyed and all crops thereon, or to collect the rents therefrom . . . ." In *Central Savings Bank v. First Cadco Corp.*, 186 Neb. 112, 181 N.W.2d 261 (1970), we held that such a provision in a mortgage is valid and enforceable.

The issue is whether Metropolitan has the better right to the proceeds from the crops on parcels 1 and 2 because Reeves-Gustafson's interest was rent, or whether Omaha National's security interest attached because growing crops otherwise are subject to a perfected security interest.

Before a security interest can attach to the property of a debtor, the debtor must have rights in the collateral. Neb. U.C.C. § 9-203(1)(c) (Reissue 1980). Under § 9-203(5)(a), a debtor has no rights in crops until they are planted or otherwise become growing crops. Before the security interest of Omaha National could attach to the crops planted by Dobson, Reeves-Gustafson had to have some rights in the crops. Generally, where the rent reserved is in kind or a share of the

crops to be raised, the landlord and tenant are tenants in common of the growing crops. *A nest v. Chester B. Brown Co.*, 169 Neb. 330, 99 N.W.2d 615 (1959); *Wendt v. Stewart*, 74 Neb. 855, 105 N.W. 550 (1905); *Sims v. Jones*, 54 Neb. 769, 75 N.W. 150 (1898). Reeves-Gustafson planted no crops on parcels 1 and 2, which had been leased to Dobson, but the lease to Dobson contained provisions which gave Reeves-Gustafson an interest in the corn to be paid as rent.

The lease contained a provision that Reeves-Gustafson,

should they deem it necessary, may, at the cost and expense of [Dobson], employ men and equipment to go upon said premises and cultivate the crops and harvest them or do anything that is necessary to promote their growth or save them at any time before they are in the granaries, the whole expense of the same to be a lien upon [Dobson's] share of said crops.

The lease further provided that Dobson "shall secure the performance of the terms and conditions of this lease on their part by giving to [Reeves-Gustafson] on demand a chattel mortgage upon all or any part of the crops growing or gathered on said premises during said term."

Reeves-Gustafson's only right or interest in the crops planted and harvested by Dobson was as rent due under the lease to Dobson.

Neb. U.C.C. § 9-104(j) (Reissue 1980) excludes from article 9 coverage "the creation or transfer of an interest in or lien on real estate, including *a lease or rents thereunder*." (Emphasis supplied.)

In *Citizens Bank, etc. v. Wy-Tex Livestock Co.*, 611 S.W.2d 168 (Tex. Civ. App. 1981), the Cockrell Cattle Company had assigned to the bank the rents due it under a lease of a feedyard to International Cattle Systems. Wy-Tex recovered a judgment against Cockrell and then attempted to garnish International for rent payments due Cockrell. The trial court held that Wy-Tex was entitled to $39,372.04 owed to Cockrell. On appeal the judgment was reversed because the Uniform Commercial Code does not apply to an assignment of rents. The court stated:

In syllogistic form, Wy-Tex's major contention for

affirmance is that under section 9.102(b) of the Texas Business and Commerce Code, the assignment of the rental payments is a security interest; that under section 9.401(a)(3) of the Code, the Bank is required to file a financing statement with the Secretary of the State of Texas to perfect any prior right to the rental payments in question or to preclude subsequent garnishment of such payments; that the Bank did not file such a financing statement with the Secretary of State; and that, because of its garnishment proceeding, Wy-Tex has a prior right to the rental payments in question. It is undisputed that the Bank did not file a financing statement with the Secretary of State and it does not so contend. However, the Bank maintains that section 9.104(10) of the Code excludes this assignment of the lease payments from the operative effect of chapter nine of the Code.

Section 9.102(b) provides: "(b) This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This chapter does not apply to statutory liens except as provided in Section 9.310."

Section 9.104 provides, in pertinent part: "This chapter *does not* apply . . . (10) . . . to the creation *or transfer of an interest in* or lien on *real estate, including a lease or rents thereunder* . . . (emphasis added)."

In support of its position, Wy-Tex relies primarily on *United States v. PS Hotel Corp.,* 404 F.Supp. 1188 (E.D.Mo. 1975), *aff'd per curiam,* 527 F.2d 500 (8th Cir. 1976). In that case, the court determined that a motel operator's charges for the use of rooms by its customers are accounts receivables rather than rent payments under a lease of an interest in real estate. *Id.* at 1192. Thus, in effect, the court determined that charges for rooms used by the motel's customers are not excluded from the operative effect of chapter nine of the Uniform Commercial Code by section 9.104(10). We do not

consider the court's determination in *PS Hotel Corp.* controlling or persuasive in the case before us.

In this instance, we reiterate that Gene O. Cockrell and Cockrell Cattle Company, Inc., as lessors, leased to International, as lessee, certain real property located in Gray County, Texas, including a feedlot situated thereon for a term of 24 months with a renewal option as provided therein. The lessors unconditionally assigned to the Bank all rents due and payable under the terms of the lease. Section 9.104(10) states that chapter nine of the Code does not apply to a transfer of an interest in real estate including a lease or rents thereunder. In Texas, a lease is an interest in real estate. *Holcombe v. Lorino*, 124 Tex. 446, 79 S.W.2d 307, 310 (1935). By using the words "including a lease or rents thereunder," the legislature made it abundantly clear that rents payable under a lease of real property were excluded from the operative effect of chapter nine of the Code. See In the *Matter of Bristol Associates, Inc.*, 505 F.2d 1056, 1064 (3d Cir. 1974).

In *Bristol*, the court construed Section 9-104(j) of the Pennsylvania Code, which is identical to Tex.Bus. & Com.Code Ann. § 9.104(10) and section 9-104(10) of the Uniform Commercial Code. The court concluded: "[T]he drafters who wrote Article 9 and the legislators who enacted it into law intended section 9-104(j) to be interpreted sufficiently broadly to exclude the assignment of a lease and rents thereunder from the operation of Article 9. The burden of those who would propound a different view is to persuade the State Legislature. We should not usurp the legislative function." *Id.* at 1064. Although we find no Texas cases construing section 9.104(10) of the Texas Code, we consider the court's determination in *Bristol* and its rationale persuasive in this instance. Accordingly, we overrule Wy-Tex's contention. 611 S.W.2d at 170-71.

In *In re Bristol Associates, Inc.*, 505 F.2d 1056 (3d Cir. 1974), cited by the Texas court, the issue was whether the Uniform Commercial Code applied to a security interest in a lease given by the lessor. The court stated the question as follows:

If the assignment of the lease to Girard is a transaction within the scope of Article 9 and if Girard's interest has not been perfected, then Girard cannot successfully assert its security interest against the Receiver. If, however, the assignment of a lease is excluded from Article 9, the filing and perfection provisions of that Article are not applicable, and Girard's security interest in the lease and in the rents from the lease would not be subordinated to the Receiver.

. . . .

The question confronting us here thus becomes whether "an interest in real estate" subsequently employed in a "transaction which is intended to create a security interest" is covered by section 9-102, placing the transaction under the Code, or by section 9-104(j), placing the transaction outside the Code.

505 F.2d at 1058-59.

In holding that the Uniform Commercial Code did not apply to assignment of a lease or the rents thereunder, the court stated:

The evolution of the Code since its original enactment, the views of authorities and the realities of the pertinent business practices have persuaded us that the intent of the Legislature was to exclude from the filing and perfection provisions of Article 9 the use of a lease as collateral for a loan.

Sections 9-102 and 9-104 have both been amended since their original enactment. Together, the amendments limit the application of section 9-102 where transactions touch realty and, simultaneously, provide greater explicitness in section 9-104(j), exempting both the creation and transfer of interests in realty. The amendments were proposed in order to clarify the Code as ambiguities in language became evident, rather than to alter the direction or scope of the Code.

As originally enacted in Pennsylvania, section 9-102 did not contain subsection (3). In 1959 subsection (3) was added, accompanied by the explanatory Comment 4. Since the effect produced by Comment 4 was not clear, the

Conference of Commissioners on Uniform State Laws and the American Law Institute recommended, in 1962, that the Comment be modified. Before and after the amendment, the relevant portion of Comment 4 read: "However, when the mortgagee in turn pledges this note *and mortgage* to secure his own obligation to X, this Article is applicable to the security interest thus created in the note *and the mortgage* [which is a security interest in an instrument even though the instrument is secured by a real estate mortgage]. (Emphasis indicates the relevant 1962 deletions; brackets indicate the relevant 1962 addition.)" The changes in wording produced two effects. First, deletion of the references to mortgages distinguishes between the pledge of a note, a separate and distinct contract, and the underlying real estate mortgage. Where a promissory note and mortgage together become the subject of a security interest, only that portion of the package unrelated to the real property is now covered by section 9-102. Second, the added language makes explicit that the promissory note itself falls within the scope of Article 9 by virtue of its status as an instrument. Since a lease of real property is clearly not an instrument, inclusion of its assignment in Article 9 by reason of analogy to the promissory note would be strained. The amendments clarify the rationale of applying Article 9 to the promissory note. They refute the possibility that Article 9 reaches out to encompass every transaction colorably included under section 9-102.

The amendments made to section 9-104 lend further support to the position that the legislators did not intend to include in Article 9 the assignment of a real estate lease. As originally enacted, the Code did not contain section 9-104(j); rather, section 9-104(b) excluded from Article 9 coverage "a landlord's lien or a lien on real estate." Act of April 6, 1953, P.L. 3; § 9-104. Following the recommendation of the Permanent Editorial Board of the Uniform Commercial Code, the Legislature in 1959 adopted the language presently set forth in section 9-104(j). Act of October 2, 1959, P.L. 1023 § 9. The

change was promoted by the Board in the interest of "greater clarification and precision as to the types of transactions entirely excluded from the operation of Article 9." 1956 Recommendations of the Editorial Board for the Uniform Commercial Code, 257-58. The language of section 9-104(j) substantially broadens the earlier exclusion by providing that Article 9 does not apply to "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder."

Our conclusion, that lenders need not conform to the requirements of Article 9 in order to retain their security interest in a real estate lease assigned to them as collateral, is supported, apparently unanimously, by authorities who have considered this problem. Included are many of the persons responsible for the drafting of the Code and its subsequent revisions. Carl Funk, a leading expert on the Code and its application in Pennsylvania, stated that "a bank lending on the security of an assignment of a lease or of the rentals payable by the tenant need not comply with the Code in any way."

In their treatise, Coogan, Hogan & Vagts first aver that a promissory note when used as collateral is covered by the Code even if secured by a mortgage, citing section 9-102(3) and Comment 4. However, they continue by asserting that, "[t]hough estates for years are for some purposes considered personal property, the Code would not seem to cover the mortgage of a lease on realty." 1A Secured Transactions under the Uniform Commercial Code § 16.04[1] at 1698 (1973). The authors cite section 9-104(j) for this proposition. The notion that the assignment of a lease or of rents thereunder as collateral might be considered a security interest in personal property controlled by Article 9 is dismissed as "unduly fearful." The authors state that "[t]he clear intent of section 9-104(j) * * * would be completely nullified" by such an interpretation.

. . . .

One final consideration buttresses the conclusion that the lease when used as collateral should be exempted from

Article 9. The universal practice of Pennsylvania lenders in these circumstances is to ignore any application of the Code to leases received as collateral. A bank often takes an assignment of a lease or the rents due under a lease as security for a loan. C. Funk, Banks and the Uniform Commercial Code 61 (2d ed. 1964). Collateral of very substantial value is involved in such loans, which are granted regularly and repeatedly in the world of finance. Parties to these loans "are apt to think for good reasons that they are outside the scope of Article 9." Hawkland, 77 Com.L.J. 79, 84 (1972).

. . . .

. . . On balance, this Court concludes that the drafters who wrote Article 9 and the legislators who enacted it into law intended section 9-104(j) to be interpreted sufficiently broadly to exclude the assignment of a lease and rents thereunder from the operation of Article 9.

505 F.2d at 1060-62, 1064. See, also, *In re Patterson*, 64 Bankr. 189 (Bankr. N.D. Ill. 1986); *In re Standard Conveyor Co.*, 773 F.2d 198 (8th Cir. 1985).

With respect to the cross-appeal, Metropolitan claims an interest in the proceeds from the crops grown on parcel 3 only, as an unsecured creditor. Although a part of the crops grown on parcel 3 was due Reeves-Gustafson as rent, Metropolitan acquired no lien on this portion of the crops. In the hands of Reeves-Gustafson, the crops became subject to the lien of Omaha National's security interest, which was paramount to the interest of any unsecured creditor.

The judgment of the district court is affirmed.

AFFIRMED.

CAPORALE, J., not participating.